OF MARYLAND. 365

The Regents of the University of Maryland vs. Williams.—1838.

## The Regents of the University of Maryland vs. Joseph B. Williams.—*June*, 1838.

A corporation may be *private*, and yet the act, or charter of incorporation, contain provisions of a purely public character, introduced solely for the public good, and as a general police regulation of the state.

If the acts of 1807, ch. 53, and 1812, ch. 159, by conferring authority to grant diplomas, may be regarded as repealing so much of the act of 1798, ch. 105, as provides for the payment of $10 for a license to practise, and imposes a fine for practising without license, and are therefore in violation of the rights conferred by the latter act; they are not for that reason wholly unconstitutional and void, but only so far as the authority to grant diplomas extends.

But the right to grant license to practise, for a fee, and to a portion of the penalty for practising without license, given to the Medical and Chirurgical Faculty, by the act of 1798, ch. 105, is not such an inviolable vested right, as to be beyond the reach of the legislature.

The act of 1798, in that respect, is penal and sanatory, looking to the health, and lives of the citizen, and as such might be revoked at the pleasure of the legislature.

The power in question is a political one, and in granting it to the corporation, the good of the public was the object contemplated, not the regulation, or promotion of private interests.

A corporation aggregate, is an artificial intellectual being, composed generally of persons in their natural capacity, but it may also be composed of persons in their political capacity, of members of other corporations.

The corporation of "The Regents of the College of Medicine of Maryland," created by the act of 1807, ch. 53, is not destroyed or merged in the corporation of "The Regents of the University of Maryland," created by the act of 1812, ch. 159, independently of the constitution of the United States, or of the bill of rights, and constitution of this state.

They exist as distinct and independent corporations, in possession of all the rights and franchises conferred upon them respectively, by the acts of their incorporation; those rights and franchises, being entirely compatible, and the powers and authority of the one, not inconsistent with, or opposed to the powers and authority of the other.

The corporation of "The Regents of the University" is a private, and not a public corporation.

It was not created for political purposes, nor invested with political powers.

If a corporation be eleemosynary, and private at first, no subsequent endowment of it by the state can change its character.

It is not sufficient to render a corporation public, that its ends are public.

Whether a corporation be public or private, depends upon the nature of the franchises granted, and not the expected beneficial results to the community, from the possession and exercise of those franchises.

The Regents of the University of Maryland *vs*. Williams.—1838.

Public corporations are to be governed according to the laws of the land, and the government has the sole right as trustee, to inspect, regulate, and control them, whilst the same right, in reference to private corporations, appertains to the visitors alone, under the visitatorial power incident to such corporations.

Colleges and academies, established for the promotion of piety and learning, and endowed with property by public and private donations, are, in a legal sense, equally with hospitals for the relief of the poor, sick, &c. considered as private eleemosynary corporations. A charter, or act of incorporation, when accepted, is a contract, protected by that clause of the constitution of the United States, which declares, that "no state shall pass any law impairing the obligation of contracts."

The act, therefore, incorporating "The Regents of the University," having been accepted, constituted a contract, protected by the constitution of the United States, and the act of 1825, ch. 190, impairing the obligation of that contract, is repugnant to that instrument, and consequently void.

And independently of the constitution of the United States, and of this state, that act is void as opposed to the fundamental principles of right and justice, inherent in the nature and spirit of the social compact.

The legislature has no right, without the consent of a corporation, to revoke or alter its charter, or take from it any of its franchises or property; not that a corporation is clothed with any peculiar sanctity, but because its property and franchises *are private property*, and under the safe-guard of the same principle, that protects the property and rights of individuals.

The act of 1825, professes to discontinue and abolish the corporation of the Regents of the University, and to appoint a board of trustees composed of different persons, and to transfer to them all the franchises and property of the corporation intended to be abolished. In this respect, if effectual, it would amount to a legislative ouster; a legislative judgment of dissolution, and as such in opposition to the 6th article of the bill of rights, which declares, "that the legislative, executive, and judicial powers of the government, ought to be forever separate and distinct from each other,"—and also to the 21st article of the same instrument, declaring "that no freeman ought to be taken, or imprisoned, or disseized of his freehold, &c. but by the judgment of his peers, or by the law of the land."

An act which only affects, or exhausts itself upon a particular person, or his rights and privileges, and has no relation to the community in general, is rather a sentence than a law.

It may be questioned whether an unconstitutional act of the legislature can be made constitutional and valid, by a subsequent acquiescence in it.

It is not necessary to the constitutionality of an act for altering a charter, to the passing of which, previous assent has not been given, that it should by its *terms*, be made to depend upon subsequent assent.

The passing of it, with nothing more, amounts to an offer only for acceptance, and if afterwards accepted, either expressly, or by acting under it, it then receives life, and becomes an operative law.

But the acts, from which the assent of an existing corporation, to an alteration of its charter, may, and can alone be inferred, must be corporate acts, or

acts of its authorized agents, or officers. The acts, or declarations of particular members, do not bind the corporation.

Nor can the assent of a corporation to an act, altering, or destroying its charter, be inferred from the fact, that individual members, accepted, and held offices under the new corporation, which it was the object of the act to create.

Neither non-user or mis-user, of corporate franchises, has ever been held sufficient to authorize the granting the same franchises to others, before a forfeiture has been judicially declared.

An inference of assent by a corporation to an act of assembly after it has been passed, can no more be drawn from a subsequent non-user, or misuser of its franchises, than an inference of consent to its being passed, can be drawn from a previous non-user or mis-user.

Nor can the non-user by a corporation of its franchises, be considered as equivalent to a surrender of them—that can only be done by deed to the state.

Neither are courts warranted in presuming a surrender of the corporate rights, and a dissolution of the corporation, from a mere intentional abandonment of the franchises, unless there be something in the act of incorporation to justify it.

If either of the faculties of a corporation consisting of integral parts, is lost, and not restored at the time of bringing a suit by such corporation, the action cannot be maintained.

But the acceptance of office by the members of one of the faculties of an old, under a new corporation, does not in law amount to a resignation of their offices under the former, nor to a dissolution, or suspension of its franchises.

An office in a corporation may be resigned in two ways; by an express agreement between the officer and the corporation, or by an agreement implied from his being elected to another office *in the same corporation*, incompatible with it—and such resignation is not complete until the corporation shall have manifested its acceptance of the offer to resign, either by an entry in its books, or electing another person to fill the place, treating it as vacant.

When the fact of incorporation is shown by the plaintiff, the burden of showing a dissolution is thrown upon the defendant.

A corporation cannot be considered as being composed of distinct, definite, integral parts, unless the number of the members of each class is definite, and a majority of the members of each, is necessary to constitute a corporate meeting or assembly. No advantage can be taken of any non-user or mis-user on the part of a corporation, by any defendant, in any collateral action.

There are two modes of proceeding judicially to ascertain and enforce the forfeiture of a charter. The one by *scire facias* when there is a *legally* existing body capable of acting, but who have abused their power; the other by information in nature of a *quo warranto*, which applies where there is a corporate body, *de facto* only, who take upon themselves to act, though from some defect in their constitution, or organization, they cannot legally exercise their powers. And the proceedings in both cases must be at the instance of the government, and in no other way.

The defendant, the treasurer of the trustees of the University, was held liable to the corporation of the Regents, in an action for money had and received, for any money to which, as Regents, they could shew themselves entitled, amounting to a sum within the jurisdiction of the court, remaining in the hands of the defendant at the time the suit was brought, and which was received by him, as such treasurer, at any time within the three antecedent years. The act of limitations relied on by the defendant, barring a recovery for previous receipts.

APPEAL from *Baltimore* county court.

THIS was an action of *assumpsit*, instituted by consent to December, 1837. The plaintiffs counted for money had and received to their use, and the defendant pleaded the general issue and limitations.    On these pleas issues were joined.

It was agreed that either party shall be at liberty to have considered as offered in evidence in the case, any certified copies, by the proper keeper, of any original papers laid before the legislature, or any branch of it, relative to the University, from the year 1807 to the present time, to have the same effect and operation, and no other, as if said papers were actually produced at the trial, and open to all exceptions to which the same would be liable if so actually produced; and that the record or minute-book of the proceedings of the *Trustees of the University of Maryland,* offered in evidence by the defendant, and the record or minute-book of the Board of *Regents of the University of Maryland,* excepting the list of alleged donations at the end of the same, offered in evidence by the plaintiffs, or any part of either of said record books, may be read and used in the Court of Appeals on the trial of this case before said court, as if the same had been incorporated at large in the statement in the record of the evidence offered by the parties, and in like manner, that the diploma offered in evidence may be read from the original paper in the Court of Appeals.    And it is further agreed, that all the evidence offered by either party shall be open to all exceptions in the Court of Appeals, in the same manner as if exceptions to the same had been taken to the same as offered.    And it is also agreed, that any act of assembly, public or private, may be read from the statute book on said trial.

At the trial of the cause the plaintiffs, to prove the issue on their part, offered in evidence the act of the general assembly of Maryland, passed at November session of the year 1807, chapter 53, entitled, " An act for founding a College of Medicine in the city or precincts of *Baltimore,* for the instruction of students in the different branches of medicine," which, it was agreed, might be read from the printed statute book. And also offered in evidence, the petition upon which said act was passed.

And further, the plaintiffs offered in evidence, the act of the general assembly of Maryland, passed at November session of the year 1812, chapter 159, entitled, " An act for founding a University in the city or precincts of *Baltimore,* by the name of the University of Maryland ;" and also offered in evidence the petition upon which the said act was passed. And also offered in evidence, the votes and proceedings of the house of delegates and senate of the general assembly of Maryland, of the sessions aforesaid, of the years 1807 and 1812, which, together with the last mentioned act of assembly, it was agreed might be read from the printed publication. And the plaintiffs further offered in evidence, the minute-book of the Regents of the University of Maryland, excepting, however, the entry or statement therein in relation to donations, which it was agreed should not be inserted in the record, but that the original book might be used at the hearing of this cause. And the plaintiffs, further to prove the issue on their part, read in evidence the first section of the act of said general assembly of Maryland, passed at November session, 1803, chapter 92, which it was agreed should be read from the printed statute book. And they further offered in evidence, that the said persons, claiming to be the corporation of " the Regents of the University of Maryland," entered upon and prosecuted the business and purposes of said corporation, and that lectures were delivered, and courses of instruction in medicine and law, and in the other faculties, were given regularly and constantly, by professors appointed under the act aforesaid, creating the corporation aforesaid, of " the Regents

47        v.9

of the University of Maryland," and that degrees from time to time, were conferred, as authorized by said act.   And further offered in evidence, that the professors of the faculty of physic and the professors of law, of the said University, at an early period after the passage of the said last mentioned act, and before the year 1826, incurred at various times large personal responsibility, which is mentioned in the deeds given in evidence by the defendant, and which was discharged in the manner mentioned in said deeds by the trustees.   And the plaintiffs further offered in evidence, that from time to time, after the corporation aforesaid went into operation under the act aforesaid, of the session of the year 1812, chapter 159, and before the year 1826, donations were made to the said corporation, for the uses and purposes thereof, of minerals and books, of the value of two thousand dollars.   And the plaintiffs further offered in evidence, the act of the general assembly of Maryland, of December session, of the year 1821, chapter 88, entitled "An act relating to the University of Maryland," which, by agreement, may be read from the printed statute book.   And also offered in evidence, that in pursuance of said act, the medical professors of the University of Maryland, entered into bonds for the interest, and paid the said interest from year to year, required of them by said act. And the plaintiffs further offered in evidence, that shortly after the passage of the act of the general assembly aforesaid, of December session of the year 1825, chapter 190, there was sent to the governor, as claiming to be president of the board of trustees, and to each of the persons then claiming to be trustees under the said act, a notification or protest, from a committee of the Regents of the University of Maryland, authorized and directed by said regents to give such notification.

And the plaintiffs further read in evidence, the report of a joint committee of the house of delegates and senate of Maryland, at a session of the general assembly, of December session, 1825, and the documents accompanying the same.

And the plaintiffs further offered and read in evidence, the 5th of a series of resolutions, passed by the persons claiming

to be the Trustees of the University of Maryland, on the 15th day of June, 1826, as the same are entered on the minute book of said trustees, offered in evidence by the defendant. " Resolved, that it shall be the duty of the treasurer, having given bond in the penalty of fifty thousand dollars, with such security as may hereafter be approved of by this board, to receive all the moneys and funds of the University, and to deposite the same in the Bank of Baltimore, in the name of ' the Trustees of the University of Maryland,' to keep exact accounts of all receipts and payments, but no payments shall be made except by checks of the treasurer, countersigned by one of the executive committee, and he shall report statements of the finances of the institution when thereto required by the executive committee, and at all regular meetings of the trustees." And also proved by *Samuel H. Bowly*, a book-keeper in the Bank of Baltimore, that on the 1st December, 1837, there was a balance of cash in said bank, to the credit of the University of Maryland, of $2,360 11. That the ledger account of said University, which he kept as such book-keeper, is headed " The University of Maryland," and that the pass or bank book is headed, " Dr. The Bank of Baltimore in account with the Trustees of the University of Maryland," and that the first entry on the scratcher of money deposited under the said 5th resolution, which was on the 2d of August, 1826, is " Trustees of the University of Maryland." And the defendant proved by said *Bowly*, that he has no knowledge that the manner in which the ledger account is headed, as before stated, was known to the trustees of the University, or the treasurer.

And the plaintiffs further offered in evidence, from the minute books of the trustees of the University of Maryland, produced by the defendant, an account and report of the executive committee, dated May the 2d, 1836, from which it appeared, that there was a cash balance in the treasury on that day of $682 94.

The defendant thereupon offered in evidence, the act of assembly of December session, 1825, ch. 190, and the

minutes of the proceedings of the trustees of the University of Maryland, appointed under said act, which (with all other acts of assembly offered in evidence by either party) is agreed may be read and referred to in the Court of Appeals, as if incorporated with the record of this cause.   He likewise proved that the said minutes of proceedings were until the 11th day of April, 1836, made and entered by *Louis Eichelberger*, the secretary of said board of trustees, and that the letters of acceptance from the professors named in the resolution of the 12th July, 1826, except those produced by defendant, were destroyed by fire in the year 1834, and that the said *Louis Eichelberger* is since dead.

He further offered in evidence, the letters of *Professor Pattison, Bishop Kemp*, and *Dr. Wyatt*, accepting professorships under the board of trustees.

The defendant then offered in evidence, the acts of assembly following, viz:

1798, ch. 105.   1826, ch. 261.   1827, ch. 68, 198.   1830, ch. 50.   1831, ch. 270.   1832, ch. 315.   1833, ch. 62.

And the acts following, viz:   1807, ch. 111.   1809, ch. 96.   1813, ch. 125.   1816, ch. 78.   1817, ch. 154.   1819, ch. 105, 163.   1820, ch. 121.   1825, ch. 188.   1826, ch. 261.   1827, ch. 198.

The defendant further offered in evidence, that at the time the act of 1825 was passed, the board of Regents of the University of Maryland consisted of the persons and composed of the faculties, following, viz:

*Provost*—Rev. James Kemp.

*Faculty of Physic*—Alexander McDowell, John B. Davidge, Nathaniel Potter, Elisha De Butts, Samuel Baker, Granville Sharp Pattison, Richard W. Hall.

*Faculty of Divinity*—Rev. Dr. Wm. E. Wyatt, Rev. Wm. Nevins, Rev. J. D. Kurtz, Rev. Geo. Roberts, Rev. Dr. Williams, Rev. John Glendy, Rev. J. P. K. Henshaw.

*Faculty of Law*—David Hoffman, George Winchester, William Frick, Nathaniel Williams, Jonathan Meredith, Roger B. Taney, U. S. Heath.

*Faculty of Arts and Sciences*—Rev. John Allen, Edward C. Pinkney, Charles W. Hanson, Wm. Howard, John P. Kennedy, John D. Craig.

And that of the said persons authorized to compose the said faculties, the following named, viz: the Rev. Dr. Kemp was appointed, accepted and acted till the period of his death, as the Provost of the University of Maryland, under said act of 1825, ch. 190. That all the persons composing said faculty of physic as aforesaid, were re-appointed by the board of trustees of the University of Maryland, accepted and acted in fact, under said act of 1825, ch. 190, and are the persons mentioned by those names in the minutes of proceedings of the trustees aforesaid. That of the persons composing the faculty of divinity, the Rev. Dr. Wyatt and Rev. Dr. Williams were re-appointed by said board of trustees, accepted and acted under the act of 1825, ch. 190—and that of said faculty, the Rev. Dr. Roberts and the Rev. J. P. K. Henshaw, were by said act of 1825, ch. 190, appointed trustees of said University of Maryland, and acted in said capacity. That of the persons composing the faculty of law as aforesaid, David Hoffman, Esq. was re-appointed by said board of trustees, accepted and acted as professor of law under said act of 1825, ch. 190. And that Nathaniel Williams, William Frick, and Roger B. Taney, in said faculty named, were by said act of 1825, ch. 190, appointed members of said board of trustees of the University of Maryland, and acted as such. That of said faculty of arts and sciences, Messrs. Allen, Pinkney, Kennedy, Hanson, and Dr. Howard, were re-appointed by said board of trustees, professors, under said act of 1825, ch. 190, and acted as professors in pursuance of such appointment.

The defendant then offered in evidence the following letters of nomination, to the trustees of the University of Maryland, to wit: a letter from Professor N. Potter, of 3d October, 1826, nominating Dr. Wright for the chair of Surgery; a letter from Professor Samuel Baker, of the 7th July, 1827, nominating Dr. J. B. Davidge for the same chair; one from Professor Davidge, nominating Dr. Wright; one from Pro-

· 374    CASES IN THE COURT OF APPEALS

The Regents of the University of Maryland *vs.* Williams.—1838.

fessor McDowell, nominating Dr. Dudley for the same post. And a letter from Professor Hall, of the 14th June, 1837, nominating several professors for chairs then vacant. And that after the organization of the board of trustees under said act of 1825, chap. 190, the professors and others, under the mandate of said trustees, annually signed and issued diplomas to graduates in said University. And that the board of Regents, the plaintiffs, at no time conferred degrees or discharged other duties incident to their office as Regents, from the period of the organization of the board of trustees under the act of 1825, chap. 190, until the 18th day of September, 1837.

The defendant further offered in evidence, a deed from John E. Howard to N. Potter and others, dated 15th May, 1815, conveying to the grantees a lot of ground in the western precincts of the city, reciting that the said grantees had borrowed for the use of the Regents of the University, the sum of $6,651, and conditioned that upon the payment of the same by the said Regents, the lot should be held for their use; and a deed from the executors of J. B. Davidge to the said trustees, for his interest in the University property, duly executed and recorded, dated 29th May, 1830. And the defendant also read to the jury a deed dated 14th of January, 1832, from Richard Hall and others, physicians, and on the 10th of July, 1823, professors of the faculty of medicine in the University of Maryland, to the trustees of the University of Maryland, conveying to the latter, for a valuable consideration, the lot of ground upon which the infirmary attached to the said University is erected. And a deed dated 14th January, 1834, from Nathaniel Potter and others, conveying to the said trustees, whom the deed recites to be the successors of the Regents under the act of 1825, ch. 190, the lot of ground conveyed as aforesaid by John E. Howard to them, by his deed of the 15th of May, 1815, together with the medical college and other buildings erected thereon. And the defendant also offered in evidence, a deed from the sheriff of Baltimore county, dated the 25th of May,

1832, conveying to the said trustees the interest of one of the professors of medicine in the University of Maryland, in the lot and infirmary, sold by the sheriff to satisfy a judgment against him.

The defendant then proved, that the full amount of the purchase money for the lot, upon which the infirmary is erected, has been paid by the said trustees, and that the judgments and premiums of insurance have, from time to time, as the same became due upon the property of the University, been paid by the said trustees. He further offered in evidence the accounts of the treasurer of the said board of trustees. The defendant further gave in evidence, the particular payments following, made at the several dates stated, and to the several professors receiving the same, and for the purposes stated opposite to each payment, comprising a period from 1826 to 1836 ; and proved, that under the provisions of the act of 1821, chap. 88, and since the organization of said board of trustees, under the act of 1825, chap. 190, the professors of the faculty of physic for the time being, gave and executed bond to the state of Maryland, according to the provisions of said act; and that since the resignation of said professors, herein before named, the bond given to the state has been executed by the professors of said faculty, newly appointed by said trustees.

The defendant then read in evidence, the letters of resignation of the professors of the medical faculty, and of the professor of law, dated in 1836 and 1837 ; and proved that from the period of the organization of said board of trustees under said act of 1825, chap. 190, said trustees received, and have always since had, peaceable and exclusive possession of the buildings, grounds, and all other property and funds of said University.

The defendant also offered in evidence, two petitions of the medical faculty of the University of Maryland to the legislature, the first dated January 4th, 1834, praying to be relieved from the payment of the interest on the sum of $30,000, loaned by the state to the University in the year 1821 ; the

other dated the 30th of January, 1837, reiterating the above prayer; and also praying, that such modification might be made in the charter, as would admit the medical faculty to a limited participation with the trustees, in the government of their particular faculty.

The plaintiffs by their counsel object to the admissibility in evidence of the act of the general assembly of Maryland, passed at December session, 1825, chap. 190, entitled, &c. as offered in evidence by the defendant, because, that by the acts of 1807 and 1812, given in evidence by the plaintiff in this cause, the plaintiffs were at the institution of their suit, and still are entitled to all the rights and privileges conferred by said acts upon "the Regents of the University of Maryland," which said two acts are still in full force and effect, notwithstanding the said act of 1825, chapter 190, the same being unconstitutional and void. First, according to the provisions of the bill of rights, and constitution of the state of Maryland; and, secondly, according to the provisions of the constitution of the United States. But the court *pro forma,* admitted the evidence aforesaid. The plaintiffs excepted.

2D EXCEPTION.—And the plaintiffs further offered to prove, by *Richard Wilmot Hall,* that witness, and Dr. Pattison, and Dr. Baker, and Dr. De Butts, and Dr. McDowell, while professors of the medical faculty of the University of Maryland, and David Hoffman, while professor of the faculty of law, borrowed at sundry times large sums of money, for the purposes of construction of the buildings and the enclosure wall of said buildings of the University of Maryland, and for the purpose of procuring apparatus for the medical, and surgical, and chemical departments of the University, which sums were applied to said purposes; that the first amount of the sums raised as aforesaid, was borrowed from the City Bank of Baltimore, in the year 1813 or 1814, and was $7,000; the next sum was borrowed from the Mechanics Bank of Baltimore, in the year 1813, 1814, or 1815, and was about $2,000; that the next sum was borrowed from the Bank of Baltimore, in amount $3,000, about 1820, and before 1825; $2,000

about the year 1821; $7,000 or $8,000 about the year 1823; and that this last sum was mainly applied to the building of the infirmary belonging to said University; and that there was borrowed as aforesaid, from the Union Bank of Maryland, $5,000, about the year 1823 or 1824, and before the year 1825, which sum was applied to the repairs of the centre building of the University, and to the lateral building; that in the year 1825, the said professors of medicine and law contracted with workmen for the repairs of the centre building aforesaid, for stopping leaks of the roof; and in the spring of 1826, the said professors of medicine paid for said repairs about $480; and that there remains yet unpaid to said professors of the amount of their said advances, the sum of upwards of $14,000, principal and interest. The plaintiffs further offered to prove by the said Hall, that in the year 1813, Jeremiah Sullivan made a donation to the corporation of the Regents of the University of Maryland, an Encyclopedia; and that after the year 1813, and before the year 1825, John Spear Smith made a donation to said corporation of a valuable collection of minerals; and that between the same periods Robert Gilmor made a donation to said corporation of a collection of minerals; and that various other donations were made before the year 1825, to said corporation. But the defendant objected to the admissibility of said Hall's testimony, because of said Hall being one of the persons now, and at the institution of this suit claiming to be one of the Regents of the University of Maryland, and as such, one of the plaintiffs in this suit, and which facts were admitted by plaintiff's counsel at the time of offering said witness; which objection the court, *pro forma*, sustained, and rejected the said evidence. Whereupon the plaintiffs by their counsel excepted.

3D EXCEPTION.—And the plaintiff further offered to prove, by Maxwell McDowell, that the professors of the medical faculty, and of the law faculty of the University of Maryland, before the year 1825, borrowed money to a large amount at different times, upon their personal responsibility, for the purposes of the University, and to enable it to prosecute the ob-

jects of the University, as prescribed by the act aforesaid, incorporating the said University; and also, that there were made to the Regents of the University of Maryland, before the year 1825, various valuable donations for the benefit of said University, and in aid of its objects. But the defendant objected to the admission of said testimony, inasmuch, (as was admitted by the plaintiffs,) the said McDowell was a Regent of the University of Maryland at the time of the passage of the act of 1825, chap. 190, and at no time had resigned or been removed by the Regents, his situation as Regent. Whereupon the court, *pro forma*, rejected the evidence so as above in this exception offered. Whereupon the plaintiffs, by their counsel, excepted.

4TH EXCEPTION.—The plaintiffs then prayed the court to direct the jury, that notwithstanding the act of 1825, chap. 190, given in evidence, the plaintiffs are entitled to recover, if the jury shall believe the evidence given in the cause, and shall find that at any time within three years before the instituting of this suit, the defendant received moneys exceeding the amount of one hundred dollars, and not appropriated by him for any of the purposes of the University of Maryland, or in execution of any of the orders or resolutions of the persons or body, claiming under the act aforesaid, to be the trustees of the University of Maryland, and which shall have been claimed and received by the defendant, as treasurer of the said trustees.

2. That notwithstanding the act of 1825, chap. 190, the plaintiffs are entitled to recover, if the jury shall believe the evidence given in the cause, and shall find that at any time heretofore, the defendant received money exceeding the amount of $100, and not appropriated by him for any of the purposes of the University of Maryland, or in execution of any orders or resolutions of the persons or body claiming under the act aforesaid, to be the trustees of the University of Maryland, and which shall have been claimed and received by the defendant, as treasurer of the said trustees.

3. That, upon the evidence offered in this cause, if the jury

· OF MARYLAND. 379

The Regents of the University of Maryland *vs.* Williams.—1838.

find the same to be true, they are entitled to recover, because the act of the general assembly of Maryland, passed at the December session, in the year 1825, chap. 190, entitled, " An act supplementary to the act entitled an act for founding an University in the city or precincts of Baltimore, by the name of the University of Maryland," is unconstitutional, and therefore void.

Which said several prayers of the plaintiffs, and each of them, the court, *pro forma*, rejected, and refused to direct the jury as prayed. Whereupon the plaintiffs excepted.

The verdict and judgment being for the defendant, the Regents appealed to this court.

At the argument of the cause in this court, before BUCHANAN, Chief Judge, and STEPHEN and SPENCE, Judges.

Under the agreement mentioned in the record, the proceedings of the board of Regents of the 17th of March, 1836, were read, appointing a committee to take the opinion of counsel in relation to the constitutionality of the act of 1825, ch. 190, with a resolution that, in case the said law should be considered unconstitutional by counsel, that an address should be presented to the governor, and to the trustees appointed to the government of the University by said law, asking them to defer acting thereunder, until the subject could be again brought before the legislature ; and in case of their refusal, to adopt legal measures, to resist the execution of the law.

The counsel consulted by the committee, having given an opinion against the constitutionality of the law, they, in conformity with the resolution of the Regents, addressed a communication to the governor and trustees, on the 22d of May, 1836, (enclosing the opinion) asking them to suspend the execution of the law until the then next meeting of the legislature, when an application would be made for its repeal ; and proposing, in case of refusal, that steps should be taken for a speedy judicial decision upon its constitutionality by the proper tribunal.

These documents were also read.

Evans, Mayer, Martin, and Meredith, for the appellants, contended :

1. That the corporation of the Regents of the University, is a private corporation. They cited on this point *Act* 1817, *ch.* 154, 210. 1807, *ch.* 153. 1812, *ch.* 159. *Lightly vs. Clouston*, 1 *Taunt.* 112. *Dartmouth College vs. Woodward*, 4 *Wheat.* 518, 636, 671. *Ib.* 4 *Cond. Pet. S. C.* 539, 540, 557, 558. *Allen vs. McKeen*, 1 *Sumner*, 277, 296, 298, 299. 3 *Stor. Con. U. S.* 260. *Ang. and Ames*, 8, 21. *Act* 1812, *ch.* 159, *sec.* 9–19. 1803, *ch.* 92, *sec.* 1. 2 *Kent Com.* 300, 304, 305. *The People vs. Morris*, 13 *Wendell*, 337. *Rex vs. Cambridge, V. C.* 3 *Burr.* 1656. *Attorney General vs. Pearce*, 2 *Atk.* 87. *Stanley vs. Robinson*, 4 *Pet. C. C. R.* 544. *Case of St. Mary's Church*, 7 *Serg. and Raw.* 517. *Society, &c. vs. New Haven*, 8 *Wheat.* 464. 2 *Kent*, 275. 3 *B. Stat.* 213, *Hen.* 8. *Ib.* 794, *Hen.* 8. *Gilb. Law Evid.* 12, 13.

2. That the charter of such a corporation is a contract between the state and the corporators ; and also, between the state, the corporators, and those persons who contributed to the endowment. *Dartmouth College vs. Woodward*, 4 *Pet. Con. S. C. R.* 553-4, 556, 579 *a* 583. *Ashby vs. White*, 2 *L. Ray.* 938. 14 *Law Lib.* 132. *The King vs. John Patterson*, 24 *Serg. and Low*, 1, 14. *Dartmouth College vs. Woodward*, 4 *Wheat.* 695, 629, 693, 689. *Jenk. Cent.* 270. *Plac.* 28. *Allen vs. McKeen*, 1 *Sum.* 300, 301. *Journal H. of D.* 1825, *p.* 152. *Mumma vs. the Potomac Co.* 8 *Peter*, 282. *Case of St. Mary's Church*, 7 *Serg. and Raw.* 530, 558, 559, 565. 1 *Trum. His. of Con.* 407. *Ang. and Ames*, 507, 510. *Slee vs. Bloom*, 19 *John.* 456. *Riddle vs. the County of Bedford*, 7 *Serg. and Raw.* 392.

3. That the act of 1825, ch. 190, is a law impairing the obligation of contracts, within the meaning of the constitution of the United States. *Journal H. of D.* 1825, 152. 3 *Dall.* 388, 390. *Bill of Rights*, 21 *sec.* —*art.* 10 *sec.* *Con. U. S. Terrett, et al vs. Taylor, et al*, 9 *Cranch*, 43. *Fletcher vs. Peck*, 6 *Cranch*, 88. *State of New Jersey vs. Wilson*, 7

*Cranch,* 164. *The town of Pawlet vs. Clark,* 9 *Cranch,* 292. *Dartmouth College vs. Woodward,* 4 *Wheat.* 518. *Allen vs. McKeen,* 1 *Sumner,* 276. *Norris vs. Trustees of Abingdon Academy,* 7 *G. and J.* 7. *Adams vs. Storey,* 1 *Payne, C. C. R.* 107. 11 *Peters S. C. R.* 420. *Canal Company vs. Rail Road Company,* 4 *G. and J.* 108.

4. That the act of 1825, is unconstitutional and void. *Norris vs. Abingdon Academy,* 7 *G. and J.* 7. *The Canal Bridge Co. vs. Gordon,* 1 *Pick,* 304. 2 *Kent,* 312. *Trustees of Vernon vs. Hills,* 6 *Cow.* 23. 1 *Hals.* 191. *Sutton vs. Johnstone,* 2 *Term Rep.* 513. *Canal Co. vs. Rail Road Co.* 4 *G. and J.* 107. *Allen vs. McKeen,* 1 *Sumner,* 276, 313. *Ehrenzeller vs. Union Land Co.* 1 *Rawl.* 181, 183. *Wellington, et al vs. Petitioners, &c.* 16 *Pick,* 96, 98, 99. 3 *Sto. Com.* 262. *Ang. and Ames on Corp.* 504, 505. *Dartmouth College vs. Woodward,* 4 *Wheat.* 688. *Case of St. Mary's Church,* 7 *Serg. and Raw.* 559.

5. That the individual members of the corporation of The Regents of the University of Maryland, have no individual interest in the corporate property of that institution, and are not individually liable for its corporate debts, and that Drs. Howard and McDowell are consequently competent witnesses in this cause. *The City Bank vs. Bateman,* 7 *Harr. and John.* 105. *Nor. Peake,* 219. 1 *Stark,* 126. *Weller vs. the Governor of the Foundling Hospital, Peake's Cases,* 153.

6. That assuming the act of 1825 to be unconstitutional, the appellant is entitled to recover in this action. *Acts of 1798, ch.* 105. 1807, *ch.* 153. 1812, *ch.* 159. 1816, *ch.* 78. *Wellington, et al vs. Petitioners,* 16 *Pick,* 96. *Dillingham, et al vs. Snow,* 5 *Mass.* 554. *Angel and Ames,* 514. *Hall vs. Marston,* 17 *Mass.* 575. *Chapman vs. Williams,* 7 *Harr. and J.* 157. Upon the forms of the prayers. *Graham and Parran vs. Harris, Parran & Co.* 5 *G. and J.* 493.

NELSON and R. JOHNSON, for the appellees, contended:

1. That the act of 1812, ch. 159, incorporating the Regents of the University of Maryland, cannot be regarded

as a contract, the corporation thereby created, being a public corporation. *Mumma vs. the Potomac Co.* 8 *Peters*, 281.

2. That the act of 1825, ch. 148, is not repugnant to the constitution of Maryland or of the United States. *McCulloh vs. the State of Maryland*, 4 *Wheat.* 424, 428, 429. *Mumma vs. Potomac Co.* 8 *Pet.* 281. *Wellington, et al vs. Petitioners*, 16 *Pick*, 98. 1 *Kidd*, 67, 68. *The King vs. Larwood*, 1 *Lord Ray.* 29, 32. *Allen vs. McKeen*, 1 *Sum.* 303. *Rex vs. Hughes*, 5 *B. and Cres.* 886.

3. That assuming said law to be unconstitutional, still the plaintiffs below were not entitled to recover in this suit, because of the acts of said Regent subsequent to the passage of said law. *Kent Com.* 308, 309. *The King vs. John Pasmore*, 3 *Term*, 199. *The King vs. Morris*, 4 *East*, 17. *The King vs. Morris and Stewart*, 3 *East*, 213. *The King vs. Miller*, 6 *T. R.* 279. *Smith vs. Smith*, 3 *Des.* 557, 576, 577, 578, 580. *King vs. Hughes*, 12 *Serg. and Low*, 399. 14 *Law Lib.* 133, 135. *Bank U. S. vs. Dandridge*, 12 *Wheat.* 70. *Union Bank vs. Ridgely*, 1 *H. and G.* 426. *The Canal Bridge vs. Gordon*, 1 *Pick*, 297. *Canal Co. vs. Rail Road Co.* 4 *G. and J.* 106, 107, 150, 151. *The King vs. Sir G. Chetwynd*, 14 *Serg. and Low*, 111. *The King vs. Wardroper*, 4 *Burr.* 2024. *Hampshire Co. vs. Franklin Co.* 16 *Mass.* 86. *Riddle vs. Proprietors of Locks*, 7 *Mass.* 184. *Canal Bridge vs. Gordon*, 1 *Pick*, 297, 304, 308. *Wellington, et al vs. Petitioners*, 16 *Pick*, 97.

4. That there is no evidence in the record to show any assumpsit by the defendant to the plaintiffs, and that they therefore were not entitled to recover in this suit. *White vs. Bartlett*, 23 *Serg. and Low.* 312. *Nickolson vs. Knowles*, 5 *Mad.* 47. *Blackburn vs. Scholes*, 2 *Camp.* 344. *Dixon vs. Hammond*, 2 *Barn. and Ald.* 310. *Roberts vs. Ogilby*, 9 *Price*, 269. *Gasling vs. Birnie*, 7 *Bing.* 339. *Travis vs. Claiborne*, 5 *Munf.* 435.

5. That the testimony proposed to be given in the trial below by Doctors Hall and McDowell, was properly rejected by the court.

6. Upon the questions of form and practice. *Agnew vs. the Bank of Gettysburg*, 2 *H. and G.* 478, 493. *Graham and Parran vs. Harris, et al*, 5 *G. and J.* 490. *Bosley vs. Chesapeake Ins. Co.* 3 *G. and J.* 450, 462. *Cole vs. Hebb*, 7 *G. and J.* 20, 26. *Duvall vs. Farmers Bank of Md. ib.* 60. *Davis vs. Leab*, 2 *G. and J.* 302. *Newson, adm. vs. Douglass*, 7 *Harr. and J.* 452. *Hicks vs. Hicks and Norris*, 5 *G. and J.* 82. *McCreary vs. McCreary, ib.* 152. *Maryland Ins. Co. vs. Bathurst*, 224. *McElderry, et al vs. Flannigan*, 1 *H. and G.* 308.

7. That if the act of 1824, ch. 148, is unconstitutional, the act of 1812, ch. 159, is likewise unconstitutional, it being repugnant to the acts of 1798, ch. 205, and 1807, ch. 153.

BUCHANAN, Ch. J. delivered the opinion of the court.

A variety of questions arise in this case, which is one of a grave and delicate character. Important as respects the interests involved, and the results to the community. What may be the effect of the decision of this court (whether beneficial or otherwise) upon the usefulness and future operations of the University, we do not know, nor is it our business to inquire; looking only, and with a single eye, as it is our duty to do, to the questions alone submitted to us, and seeking to decide them, according to the principles of law governing such questions, whatever the consequences may be. Grave and delicate, as it draws in question the validity of an act of the legislature of the state, we are not insensible to the caution with which such questions should always be approached, nor the deliberation with which they should be examined; accompanied by a becoming deference to the legislature, and its high and important functions, and a just regard to the duties and character of the judicial office.

It has been said, that a legislative act should not be pronounced unconstitutional or invalid, in a doubtful case: nor should it, where the doubt is *bona fide*, and well founded, and not the result of a disinclination to deny the authority of the legislature, which all must feel, but none should yield to

in violation of a solemn duty. But where a judge is satisfied upon full consideration, that an act of the legislature is contrary to the constitution of the United States, the supreme law which he is bound to obey, and which must prevail over any act that comes in conflict, and cannot stand with it, or is for any other reason invalid, he has no choice; and all that is left him, is honestly and fearlessly to do his duty;—from the faithful discharge of which, however unpleasant the task, no upright judge can shrink if he would. On the other hand, a judge should not suffer himself to be betrayed to pronounce an act unconstitutional or invalid on insufficient grounds, by a morbid apprehension that a contrary decision might be ascribed to the want of a just and proper sense of judicial duty. Thus impressed, we proceed to the examination of this case—and the first question presented by the record, and which meets us at the threshold, arises on the first bill of exceptions, upon an objection by the counsel of the appellants to the admissibility in evidence of the act of the legislature of this state, passed at the December session, 1825, ch. 190, (which was offered in evidence on the part of the defendant, and admitted by the court below) on the alleged grounds of its being contrary to the constitution of the United States, and to the Bill of Rights and constitution of this state, and is also raised on the first prayer in the fourth exception. The consideration of which, involves other questions upon which the validity of that act depends.

By the act of 1798, ch. 105, a number of persons were incorporated under the name and title of " The Medical and Chirurgical Faculty of the State of Maryland," with authority to elect twelve persons to be styled " The Medical Board of Examiners for the State of Maryland," whose duty it is declared to be, to grant licenses to gentlemen qualified to practise medicine and surgery, upon the payment to the treasurer of the faculty by each person so obtaining a certificate or license, of a sum not exceeding ten dollars, to be fixed on or ascertained by the faculty. And the sixth section subjects persons who shall practise in either of those branches, and

receive payment for his services, without having first obtained such license, to a penalty of fifty dollars for each offence, to be recovered in the county court where he may reside, by bill of presentment and indictment, one-half for the use of the faculty, and the other for that of the informer.

The .second section of the act of 1807, ch. 53, provides for the establishment in the city or precincts of Baltimore, of a college for the promotion of medical knowledge, by the name of " The College of Medicine of Maryland," to be founded and maintained forever. And the third section declares, that the members of the board of medical examiners for this state, for the time being, together with the president and professors of the college of medicine, shall be one community, corporation, and body politic, by the name of " The Regents of the College of Medicine of Maryland." Thus constituting those two separate and distinct bodies, as might well be done, one corporation ; and making them the regents or governors of " The College of Medicine of Maryland," for the management and conduct of which they were thus incorporated.

The fourth section gives to the regents the power to acquire, dispose of, and employ real and personal estate for the purposes of the college.

The ninth section authorizes and empowers the regents from time to time to constitute and appoint (without restriction as to number) professors of the different branches of medicine, to be " severally styled professors of such branch as they shall be nominated and appointed for, according to each particular nomination and appointment," and also to appoint lecturers in like manner. " The professors and lecturers so constituted and appointed from time to time," to be known and distinguished by the name of " The Medical Faculty of the College of Medicine of Maryland."

The twelfth section authorizes the granting diplomas, and admitting students of the college and others, to the office and profession of surgeon, and to the degrees of bachelor and doctor of medicine.

The sixteenth section appoints six persons by name to be professors, until further arrangements made by the regents of the college.

The eighteenth section constitutes "The Medical and Chirurgical Faculty of the State of Maryland," the patrons and visitors of the college; and other sections give to the regents the power to appoint a president, to have and to use one common seal, and one privy sale, and the capacity to sue and be sued, &c.

The first section of the act for founding "an University in the city or precincts of Baltimore," passed at the December session, 1812, ch. 159, provides that the college for the promotion of medical knowledge, by the name of "The College of Medicine of Maryland," be and the same is hereby authorized to constitute, appoint and annex to itself, the three other colleges or faculties, viz: The faculty of Divinity, the faculty of Law, and the faculty of the Arts and Sciences, and declares "that the four faculties or colleges thus united, shall be and they are hereby constituted an university, by the name and under the title of The University of Maryland."

By the third section it is enacted, "that the members of the said four faculties, with the Provost of the said University and their successors, shall be and are hereby declared to be one corporation and body politic, to have continuance forever, by the name and style of "The Regents of the University of Maryland," with capacity to acquire, enjoy and dispose of real and personal estate for the purposes and interests of the University.

The seventh section gives authority to the regents to appoint a Provost of the University.

The eighth section provides that "each faculty shall possess the power of appointing its own professors and lecturers."

The tenth section provides "that the professors now appointed and authorized in the College of Medicine of Maryland and their successors, shall constitute the faculty of physic; that the professor of theology, together with six ordained ministers of any religious society or denomination and their successors, shall form and constitute the faculty of divinity;

that the professor of law, together with six qualified members of the bar, and their successors, shall form and constitute the faculty of law; and that the professors of the arts and sciences, together with three of the principals of any three academies or colleges of this state, and their successors, shall form and constitute the faculty of the arts and sciences.

By the ninth section each faculty is authorized to exercise such powers as shall be " delegated " to it by the Regents of the University, for the instruction, discipline, and government of the institution, and of all students, officers, and servants, belonging to it—and the eleventh section provides that the regents shall meet at least once a year, in stated meetings, to be appointed by their own ordinances, "in order to examine into all matters touching the discipline of the institution, and the good and wholesome execution of their laws," with authority when assembled, "to make their own rules of proceeding, and to make fundamental regulations for the government and discipline of the University," and declares that at all such meetings " a majority of the whole number of regents shall be a quorum to do any business, except to vacate the seat of the provost of said University, or of the professors or lecturers; for which purpose the *consent* of three-fourths of the whole number of the regents shall be necessary, and then only on a formal impeachment," with other sections (as in the act of 1807, ch. 53, for founding a Medical College in the city or precincts of Baltimore) giving to the Regents the capacity to sue and be sued; the authority to make and use one common and public, and one privy seal, and to grant diplomas, and certificates of admission to the office and profession of surgeon, and to the degrees of bachelor and doctor of physic, &c. And the last section professes to repeal so much of the act of 1807, ch. 53, for founding a Medical College in the city or precincts of Baltimore, " as is inconsistent with, repugnant to, or supplied by " this latter act.

It has been asserted in argument, that the corporations created by these three acts are *public* and not *private* corporations; and hinted, rather than seriously insisted upon, that if they are to be considered and treated as *private* corpora-

tions, and the acts creating them as grants or contracts within the meaning and grasp of the 10th section of the 1st article of the Constitution of the United States, which declares that " no state shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts," the act of 1812, chap. 159, violates the provisions of the two preceding acts of incorporation, and is itself unconstitutional and void. ·

These propositions will be examined.

A corporation may be *private*, and yet the act or charter of incorporation contain provisions of a purely public character, introduced solely for the public good, and as a general police regulation of the state ; such as the *Stat. 14th*, 15*th Henry the 8th*, *ch.* 5, creating the College of Physicians in London, and imposing a fine on persons practising without license from the college, which was held to be a *private* corporation, *Gilbert's Evid.* 13, and the statute of the same reign, chap. 42, founding The College of Barbers and Surgeons.

The provisions of the act of 1798, ch. 105, making it the duty of the "Board of Medical Examiners" to grant licenses to such as should apply, and who, on examination, should be found qualified to practise physic or surgery, on their paying to the treasurer ten dollars, and imposing a fine of fifty dollars on such as should practise without having first obtained such license, one-half for the use of the faculty and the other for the use of the informer, are supposed to be practically infringed by the act of 1812, ch. 159, founding the University of Maryland ; by which authority is given to the Regents to grant diplomas and certificates of admission to the office and profession of surgeon, and to the degrees of bachelor and doctor of physic, &c.    Thus virtually, as it is said, removing the necessity for obtaining a license from the board of medical examiners, and in effect invading the rights of the Medical and Chirurgical Faculty, and impairing its interest in the fees for licenses, and the penalty imposed for practising without license from the board of medical examiners.    The same may be said of the act of 1807, ch. 53, by which the same authority is given to the Regents of the college of medicine to grant diplomas and certificates of admission to the office and pro-

fession of surgeon, and the degrees of bachelor and doctor of physic, that is given by the act of 1812, ch. 159, to the Regents of the University. Of this supposed violation of the rights of the Medical and Chirurgical Faculty, that institution is not here complaining, and to which no exception has ever been taken until now, for the first time, by this defendant, having no connexion with that faculty, and professing to act as an officer or agent of a board claiming to be trustees of the University, to the charter of which, this alleged infraction of the corporate rights of the Medical and Chirurgical Faculty is ascribed.

The charter of the University has no express provision dispensing with the necessity of a license to practise from the board of medical examiners, nor authorizing graduates of that institution to practise without such license.

But admitting that to be the effect of the authority to grant diplomas, and that a student of the University having obtained a diploma, would not be under the necessity to procure any other license, and would be entitled to practise without subjecting himself to the penalty provided by the act of 1798, ch. 105, and therefore would not be likely to incur the unnecessary trouble and cost of procuring any further license; and that such practical result is equivalent to a direct repeal of so much of the act of 1798, ch. 105, as provides for the payment of ten dollars for a license to practise from the board of examiners, and imposes a fine for practising without such license; and admitting also, that if such repeal would be a violation of the vested and chartered rights of the corporation, created by the act of 1798, and therefore void, and the defendant under the pleadings in this cause, has a right to avail himself of that defence, the most that can be said is, that the act of 1812, ch. 159, is unconstitutional and void, so far only as it authorizes the Regents of the University to grant diplomas, &c. and no further.

But are the rights here set up, as belonging to the Medical and Chirurgical Faculty, such inviolable vested rights as are placed beyond the reach of legislative power?

The legislature possesses the power to regulate the internal police of the state; a political power imparted to that department of the government of which it is difficult to say it can entirely disrobe itself.    It has among others, the power to pass penal and sanatory laws, and to revoke them at pleasure, as circumstances and experience may require and teach; and, having regard to the health and lives of the citizens of the state, to adopt from time to time such wholesome regulations as may be deemed best calculated to guard against the evils and mischiefs attendant upon the practice of physic and surgery by ignorant and incompetent persons.

That the legislature might at any time, without the intervention of a corporation, have provided for the organization of a board or boards, for the examination of persons applying for admission to the practise of physic or surgery, and imposed a penalty upon any who should practise without having first obtained a license from such board, and afterwards from time to time have adopted other means more or less efficient, for the promotion of the desired end; or, whether wisely or not, have removed the restriction altogether, is a proposition not to be questioned.

Impressed as it would seem, with the sense of the evil consequences flowing from the pernicious practices of pretenders to the art, the legislature in 1798, as a general police regulation, embodied, as it had a right to do, in the act incorporating the Medical and Chirurgical Faculty, with authority to appoint a board of examiners, not being of themselves a corporation, the provisions for examination and license by the board of examiners, on the payment of ten dollars by the party applying, and the prohibition to practise without such license, under the penalty prescribed.

The object is manifest.    It was to encourage and promote the acquisition of knowledge in the profession, and thereby to shield the community from the pernicious effects of the ignorance of unskilful pretenders.    And the board of examiners was resorted to as the means of effecting that end, and for that purpose may be considered as the agents or officers of the state.

It is difficult to suppose that the legislature, in adopting that regulation of internal police, intended to part with the whole political power of the state over the subject, and to transfer and repose it entirely in the corporation of the Medical and Chirurgical Faculty. The corporation acquired no vested inviolable right to that political power. The provisions under consideration were introduced, not for the regulation or promotion of private purposes or interests, but for a public purpose, the attainment alone of a public end—the prevention of mischief by the ignorant and unskilful, by the punishment of those who should be found offending against the law.

The examining and granting of licenses by the board of examiners to applicants proved to be qualified to practise, was not a franchise nor property, but in terms a duty imposed, and the allowance to the faculty of the fees for licenses, and a portion of the penalty imposed for practising without license, was merely an incident of a public regulation.

To say that the act of 1812 is unconstitutional, because, by construction, a diploma granted to a graduate of the University may entitle him to practise without being subject to a fine for not having first obtained a license from the board of examiners, would be to deny to the legislature the power to pass any law rendering a license by the board of examiners unnecessary, however expedient the further exercise of that political power may be, which we are not prepared to do.

It has been said too, that the 10th section of the act of 1812 is at war with and violates the 8th section of the act of 1798, but that will be seen, on a slight examination, to be an entire mistake. The 8th section of the act of 1798 provides that every person who shall be elected a member of the medical faculty, shall pay a sum not exceeding ten dollars, power being before given to the Medical and Chirurgical Faculty to elect other members by the " medical faculty" there spoken of, is clearly intended the " Medical and Chirurgical Faculty" created by that act. There was no other medical faculty then in being, and none other could have been meant.

The act of 1807, ch. 53, provides for a faculty consisting

of professors and lecturers, to be called the Medical Faculty of the College of Medicine; a separate and distinct institution from the Medical and Chirurgical Faculty. The act of 1812, ch. 159, authorizes the college of medicine, to constitute and annex to itself three other faculties; and declares that the four faculties united, that is, the three to 'be created and the medical faculty (then existing) of that college, shall be a University. And the tenth section directing how the four faculties of the University shall be constituted, provides that the professors now appointed and authorized in the college of medicine, shall constitute the faculty of physic; not the members of the Medical and Chirurgical Faculty, for there were no professors in that institution; and by the "faculty of physic," evidently meaning the medical faculty, one of the four faculties constituting the University; and not the "Medical and Chirurgical Faculty," to which it has no relation, and does not, in any manner whatsoever, interfere with the mode of appointing its members.

Again, it is suggested that the act of 1812, in some of its provisions, virtually repeals parts of the constitution of the College of Medicine of Maryland, and professes by the last section, to repeal all such parts of the act of 1807, as are inconsistent with or repugnant to the latter act, and is therefore void; assuming the corporation of the Regents of the College of Medicine of Maryland, created by the act of 1807, to be a private corporation.

And whether the corporation of the Regents of the College of Medicine is a distinct and independent corporation, separately existing as such in its original character, for the promotion of medical knowledge alone, or has been enlarged and expanded to the higher degree and rank of an University by the act of 1812, is the question that will be next examined.

By the act of 1807 it was provided, that there should be a college for the promotion of medical knowledge, by the name of "The College of Medicine of Maryland," established in the city or precincts of Baltimore, to be founded and maintained forever, with a president and professors, and a faculty

consisting of professors and lecturers, to be known by the name of " The Medical Faculty of the College of Medicine of Maryland," to be appointed from time to time by the regents ; and for the management or government of the institution, the president and professors, together with " the members of the Board of Medical Examiners," were incorporated by the name of " The Regents of the College of Medicine of Maryland."

Afterwards, the college being organized, the legislature by the act of 1812, ch. 159, on the petition of the president and professors of the College of Medicine of Maryland, as such, authorized " the college for the promotion of medical knowledge, by the name of the College of Medicine of Maryland," to constitute, appoint and annex to itself " three other colleges or faculties," " The Faculty of Divinity," " The Faculty of Law," and the Faculty of the Arts and Sciences ; constituting the four faculties when thus united, an University by the name of " The University of Maryland," empowering the Regents of the University to appoint a provost, and declaring the members of the four *faculties* together with the provost, to be one corporation and body politic, by the name of " The Regents of the University of Maryland," omitting throughout " The Board of Medical Examiners."

It is sufficient to say of a corporation aggregate, of which various definitions are to be found in the books, some fanciful and metaphysical, that it is an artificial intellectual being, the mere creature of the law, composed generally of natural persons in their natural capacity ; but may also be composed of persons in their political capacity of members of other corporations, as in the case of *Christ's Hospital of Bridewell*, chartered by Edward the Sixth, of which the mayor, citizens, and commonalty of London, are made the governors, and incorporated by the name of the governors, &c. of the hospital of Edward the sixth of England, of Christ Bridewell—so in the cases of the Universities of Oxford and Cambridge, of which the many colleges (distinct and separate corporations) within those Universities, form component parts of those larger cor-

porations. And the individuals, or any of them who, in their natural capacity compose one corporation, may in the same capacity, compose another distinct and separate corporation; as the president and directors of one bank, or any number of them, may be the president and directors of another bank, or the incorporated managers of any other institution. These undeniable propositions kept in view, will assist in the examination of the question under consideration.

The president and professors of the college or faculty for the promotion of medical knowledge, called The College of Medicine of Maryland, constitute that college or faculty; and the Regents of the College of Medicine, differently constituted, are made the governors and managers of the institution. The act of 1812 authorizes, not the Regents, but the College for the promotion of medical knowledge, consisting of the president and professors, to constitute, appoint and annex to itself, the three other colleges or faculties; thus by the use of the words other colleges or faculties, treating and considering the college as itself a faculty, composed of natural persons, having the capacity to act, and through whose agency alone, as natural persons, it could constitute and appoint the other colleges or faculties. If it had been the intention to give the authority to the corporation as such, it would have been given to " The Regents of the College of Medicine," and not to the college or faculty; which, with their assent could as well have been done. But no such assent appears, and the fact, that in the petition of the president and professors of the college upon which the act of 1812 was passed, they ask that " they and others and their successors may be incorporated as Regents of an University, to be called the University of Maryland," shows that the legislature acting upon that petition, meant by the college for the promotion of medical knowledge, by the name of the College of Medicine of Maryland, the faculty or the president and professors constituting the faculty, as distinguished from the corporation of Regents.

The corporation of the Regents of the college, independent

of the constitution of the United States, or the Bill of Rights and constitution of this state, is not destroyed, or merged in the corporation of the Regents of the University; which was originally to be composed of the provost, with the members of the four faculties, omitting the members of the board of examiners, (a component part of the Regents of the college) neither of them being of itself a corporation. That is, the members of the faculty (then existing) of the college, and of the three other faculties to be created; with power given to each, to appoint its own professors and lecturers. The corporation of " The Regents of the College of Medicine," and the corporation of " The Regents of the University," are presented by the acts of 1807 and 1812, as two ideal artificial beings, existing only in contemplation of law, both composed of natural persons and acting through and by the natural agents or persons composing them, respectively. And the professors of the college of medicine originally made members of the corporation of " The Regents of the University," in their natural capacity, and not in a political capacity of members of another corporation; but not therefore ceasing to be members of the corporation of the regents of the college, which is not more incompatible with the separate corporate existence of the two institutions, than if they had been made the president and directors of an incorporated bank, or been incorporated alone, or with others, as the governors or managers of any other institution, nor more than the individuals composing any corporation, and at the same time becoming members of another corporation, would be, with the continued existence of both corporations. The corporations of London, and of Christ's Hospital of Bridewell, are separately existing corporations, although the mayor, citizens, and commonalty of London, are incorporated by the name of the governors, &c. of the hospital, &c. of Christ Bridewell, so the many colleges within the Universities of Oxford and Cambridge, are separate and distinct corporations from each other, and from the larger corporations of those respective institutions.

On the 6th of January, 1813, the faculty of physic of the college of medicine of Maryland, appointed and annexed to itself the three other faculties of divinity, law, and the arts and sciences, in pursuance of the act of 1812, and on the 22d of April, 1813, at a meeting of the Regents of " The University of Maryland," a provost and secretary were elected.

Although on the original organization of the University, the professors at that time *appointed and authorized in the college of medicine*, constituted the faculty of physic of the University under the 10th section of the act of 1812 ; yet it did not follow that they were always to compose that faculty. On the contrary, the words of that section, *the professors now appointed and authorized,* &c. would seem to imply that they might not, but that as the vacancies occurring from time to time should be filled up, it might become constituted in whole or in part of other persons, there being no restriction in the selection to the professors of the college, and very properly. For if it were otherwise, the faculty itself might become extinct by the dissolution or forfeiture of the corporation of the college.

Besides, if the professors of the college of medicine and their successors, were necessarily at all times to compose the faculty of physic in the University, as the Regents of the college have alone the power to appoint their own professors, the faculty might thus become constituted of incompetent persons, by the injudicious appointment of professors by the Regents of the college, (should that at any time happen) to the great prejudice of the character and usefulness of the University, without the means of guarding against such a result.

The college of medicine then, and the University, exist in contemplation of law, as distinct and independent corporations, in possession of all the rights and franchises conferred upon them by the acts of their incorporation, each having the power to keep and use a public and privy seal; to sue and be sued ; to acquire and dispose of property, real and personal ; to pass by-laws ; to grant diplomas ; and to perpetuate itself.

And there being nothing in the act of 1807 inconsistent

with or repugnant to the act of 1812, the last section of the act of 1812 is wholly inoperative, without reference to the question whether the corporation created by the act of 1807 is a private corporation or not; nor could proceedings in nature of a *quo warranto* be sustained against the Regents of the University, acting under the authority of the act of 1812, for usurpation of corporate franchises, in violation of the rights and franchises of the Regents of the college of medicine. The enjoyment and exercise by each, of all the rights and privileges granted them respectively, being entirely compatible, and the powers and authority of one not inconsistent with or opposed to the powers and authority of the other. The legislature having the same undoubted right to establish as many independent colleges and universities in *Baltimore* (not impairing the rights of others) as may be deemed expedient and proper, that it has to incorporate an additional number of banks.

The next subject of inquiry is, whether the corporation of " The Regents of the University" is a public or a private corporation; if at this day, that can be considered an open question.

A public corporation, is one that is created for political purposes, with political powers, to be exercised for purposes connected with the public good in the administration of civil government; an instrument of the government subject to the control of the legislature, and its members officers of the government, for the administration or discharge of public duties, as in the cases of cities, towns, &c.; so where a bank is created by the government for its own uses, and the stock belongs exclusively to the government, it is a public corporation; and so of a hospital created and endowed by the government for general purposes of charity.

The corporation of the University has none of the characteristics of a public corporation. It is not a municipal corporation. It was not created for political purposes, and is invested with no political powers. It is not an instrument of the government created for its own uses, nor are its members officers of the government, or subject to its control in the due

**398    CASES IN THE COURT OF APPEALS**

The Regents of the University of Maryland *vs.* Williams.—1838.

management of its affairs, and none of its property or funds belong to the government. The state was not the *founder*, in the sense of that term as applied to corporations. It was the creator only, by means of the act of incorporation, and may be called the *incipient*, not the *perficient* founder. It gave to it in its creation the capacity to acquire and to hold property, but made to it no donation; and whatever property the corporation has, is its own, to be managed and disposed of by the Regents for the uses of the institution, in such manner as they may judge most promotive of its interests, and not for the uses of the government, nor in the exercise of any political powers, but as the trustees merely for the University. It is said there have been subsequent endowments by the state. If it be so, that cannot affect the character of this corporation. If eleemosynary and private at first, no subsequent endowment of it by the state, could change its character, and make it public. But it nowhere appears that any such endowments have been made. Several acts of assembly were passed, authorizing money to be raised by lottery for the use of the University; and by the act of 1821, ch. 88, certificates of five per cent. stock of the state were authorized to be issued by the treasurer, to the amount of $30,000, to be appropriated to the payment of the debts of the institution; the medical professors of the University being required to enter into bond for the annual payment of interest on that sum; which can scarcely be called endowments. The authority to raise money by lottery certainly was not; it was a mere privilege granted, which cost the state nothing; and the appropriation of the $30,000 to the liquidation of the debts of the institution, on the payment of interest by the professors of one of its faculties, assumes more properly the shape and character of a loan to a private corporation for its own private purposes, than of an endowment or appropriation of money for the uses or political purposes of the government.

If it is a public corporation, and its members the officers or agents of the government, and the debts contracted in the due course of that agency, they were debts of the state, con-

tracted by its own officers, which the state was bound to discharge, instead of lending money for that purpose, and taking security from the members of one of the faculties for payment of the interest, which will hardly be contended; and certainly the legislature acted upon no such principle.

But it has been urged in argument at the bar, that whenever the *end* is public, the franchise granted to effect that *end* is also public. That here, the *end* was the preservation of life and health, which depend upon the skill of those who minister to the sick, &c. A public *end*, in which the whole public have an interest, and therefore that this corporation is public.

The same might be said with equal propriety of the college of Physicians, and the college of Barbers and Surgeons, in London; where the preservation of life and health was as much the *end* as here; yet it has never been doubted, that they are private eleemosynary corporations. The act incorporating the college of Physicians was, as this, passed on the petition of certain individuals, and the preamble of the act incorporating the college of Barbers and Surgeons, as of this, recites the benefits and advantages accruing to the public from the establishment of such institutions; and each of those statutes imposes a penalty for practising without license, which would seem to give to the corporation more of a public character than this, which has no such provision.

It is not enough to say, that the public has an interest in the skill and learning of physicians and surgeons. The public has a deep interest in the dissemination of learning and useful knowledge; and so it has in the beneficial results to the community of insurance, canal, rail road, and turnpike companies, &c. The uses or objects may, in a certain sense, be called public; but the corporations as distinguished from the uses or objects, are private.

The objects for which almost, if not all corporations are created, are such as the government deems it expedient to promote, upon the supposition that they will be beneficial to the public, and these expected benefits constitute the chief, and usually the only consideration of the grants.

The distinction is between the franchise granted, and the expected beneficial results to the community, from the possession and exercise of the franchise, upon the performance of the implied condition of the grant to exert the rights acquired, in a manner suited to the promotion of the objects proposed. The institution, the bank, canal, rail road, college, &c. from the nature of its particular object, and the interest the public has in that object may, and commonly does acquire, in a popular sense, the character of a public institution; but the corporation, the artificial being composed of natural persons for the management of the affairs of the institution, in contemplation of law is private; as much so as the individuals composing it were, before the act of incorporation imparted to them an artificial existence, with power to take and hold property in that particular form, and for particular purposes, which is all the act of incorporation does, and that only because the particular objects can best be effected in that particular form. But not therefore making the artificial being or corporation an instrument, nor the persons composing it members of the civil government of the country.

Suppose an association of private individuals had contributed funds in real or personal property, for the establishment and conduct of this very University, (which, in legal understanding, would be a private charity,) and had appointed professors, and constituted them governors and managers of the institution, and of the appropriated funds; the objects being the same as now, the promotion of religion, and the dissemination of scientific, literary, and medical knowledge, and the interests of the public in those objects the same; could the governors so appointed be considered public officers, or members of the civil government? and if not, why should the artificial being created by law, and composed of the same persons for the same purposes, thereby become a part of the civil government, and a public corporation? A private charity cannot, by a mere act of incorporation, be made a public one. In the language of Lord Hardwicke, "the charter of the crown cannot make a charity more or less public, but only more per-

manent than it would otherwise be." *2 Atk. Rep.* 88, and that is the settled law upon the subject.

Again, " a charity may be public, though administered by a private corporation ; and to hold a corporation to be public, because the charity was public, would be to confound the popular with the strictly legal sense of terms, and to jar with the whole current of decisions from the time of *Lord Coke.* 2 *Kent's Com.* 273.

Public corporations are to be governed according to the laws of the land, and the government has the sole right, as trustee of the public interest, to inspect, regulate, control, and direct the corporation, its funds and franchises. That is of the essence of a public corporation. But it has no such right in relation to eleemosynary corporations, or the management of their affairs. That belongs to the visiters alone, under the visitatorial power incident to such corporations. *Angell and Ames on Corp.* 410. 2 *Kyd. on Corp.* 174. 2 *Kent's Com.* 299, 300. *Philips vs. Bury,* 1 *L. Raymond in* 2 *Term Rep.* 346, *&c. &c.* And where trustees or governors are incorporated to manage the charity, the visitatorial power is deemed to belong to them in their corporate character. 4 *Wheat. Rep.* 675. *Story J. Phillips vs. Bury,* 1 *L. Ray. in* 2 *Term R.* 346. *Ang. and Ames,* 412. 2 *Kent's Com.* 301.

The Regents of this University are made the visiters by the terms of the act of 1812, the 11th section of which authorizes them to " vacate the seat of the provost or any of the professors," and requires them to meet in annual and other stated meetings, " in order to examine into all matters touching the discipline of the institution, and the good and wholesome execution of their laws." And all the authorities agree that colleges and academies established for the promotion of learning and piety, and endowed with property by public and private donations, are, in a legal sense, equally with hospitals for the relief of the poor, sick, &c. considered and treated as private eleemosynary corporations.

It is the acknowledged law in England, received and acted upon in the courts of this country, and asserted by the ele-

mentary writers. *Phillips vs. Bury,* 1 *L. Ray.* 5, *and* 2 *Term Rep.* 346. *Lord Hale's opinion confirmed by the House of Lords, Dartmouth College vs. Woodward,* 4 *Wheat.* 518. *Allen vs. McKeen,* 1 *Sumner R.* 276. *Society, &c. vs. New Haven,* 8 *Wheat. Rep.* 464, *&c.* 1 *Kyd. on Corp.* 25. *Angell and Ames on Corp.* 2 *Kent's Com. title Corporations.* This then is a private eleemosynary corporation, differing from a college only in degree.

The extent of the property or funds it may have acquired by donation or otherwise is not material; the capacity expressly given to acquire and hold property in perpetuity, for the uses and purposes of its institution, is the same thing, so far as concerns its character as a corporation, as the actual acquisition of it would be. It appears from the statement of the evidence, that it has been endowed to a small amount by private donations, and no donations that it can derive from the bounty of the state would change its character, and convert it into a public corporation.

That a charter or act of incorporation, when accepted, is a contract, is a proposition too self-evident and universally assented to, to be drawn in question, or to require the aid of argument or authority to support it. There is no *dictum* opposed to it to be found in the books; and it would be strange if there was, assuming (what is no where denied, and cannot be,) that the government can compel none to become an incorporated body without their consent; and that acceptance of an act or charter of incorporation, is necessary to the creation of a corporate body. The grant being of the powers and franchises conferred, and the stipulation on the part of the government, that they shall be held and enjoyed on the implied condition, that they are to be exercised in the promotion of the objects of the charter; and the acceptance being an implied undertaking on the part of the grantees, that they will, in consideration of the charter and the franchises granted, perform the condition; which, as it cannot be forced upon them against their will, is necessarily a subject of contract, requiring the concurring assent of the parties respectively

concerned, and ripens into a contract for the fulfilment of the terms of the charter, when that concurrence is manifested by acceptance. In the *King vs. Pasmore,* 3 *Term R.* 97, *Buller, J.* said, "I do not know how to reason on this point better than in the manner urged by one of the relator's counsel, who considered the grant of incorporation to be a compact between the crown and a certain number of the subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves for the good government of the place."

The act of 1812, then, incorporating the Regents of the University of Maryland, being by acceptance a contract between the state and the corporation, the organization and continuing existence of which have been recognized by various subsequent acts of the legislature, is it a contract protected by that clause of the Constitution of the United States, which declares that "no state shall pass any law impairing the obligation of contracts?" This question would seem to have been fully settled by the decisions in the cases already cited, of *Dartmouth College vs. Woodward, Allen vs. McKeen, and the Society, &c. vs. New Haven.* The contract on the part of the state is, that the Regents shall have the capacity and right to acquire and hold real and personal property in perpetuity in their corporate character, to sue and be sued, a power essential to the protection and enjoyment of the property they may acquire; to pass ordinances and make fundamental regulations for the discipline and government of the University; as governors and visiters to examine into all matters touching the discipline of the institution and the due execution of their laws, and to amove the provost or any of the professors on impeachment.

It cannot be denied, that the franchises granted by the act of incorporation are vested rights, and can they be taken from the Regents by any act of the legislature without impairing the obligation of the contract, that they shall be possessed and enjoyed by them and their successors in their corporate character? It is very clear they cannot, and that no

act of the legislature of the state can effect that object without the assent of the corporation, if the prohibitory clause of the tenth section of the first article of the Constitution of the United States is applicable to such a contract as this; and no reason is perceived why it should not be held to apply as well to such contract as to any others, considering and treating this as a private corporation.     Neither the character or nature of the contracts intended to be protected, nor of the contracting parties is defined.     The generality of the prohibition " no law impairing the obligation of contracts," without any description of contract or parties, or any words of restriction, would seem sufficiently to show the intention of an equally general and unrestricted application, and embraces in its letter such contracts as this.     It is not meant to be denied that there may be contracts not within the spirit of, and therefore not embraced by this prohibitory clause.     But this being a contract clearly within the words of the prohibition, it is for those who would exclude it from the operation and protection of the constitution, to show that a strict adherence to the letter would be so inconsistent with, or repugnant to the spirit of that instrument, as to authorize the making it an exception.

There is no known rule of construction that would justify or permit an exclusion from the operation of the constitution of any contract plainly comprehended by its words, in the absence of any thing to show that it is not within its spirit. What is there to be found in the constitution distinguishing contracts of this description from any other contracts, or tending in the slightest degree to show that they were not intended to be protected?     There is nothing in their character to invite such a distinction, but much to invoke the aid of the framers of the constitution; and surely they are quite as worthy of protection as thousands of other contracts, confessedly shielded by the same provision of the constitution.

It has been suggested, that no consideration passed for this grant to give it the binding force of a contract, and that merely voluntary contracts are not within the prohibitory clause of

the constitution. It is true, that the constitution did not mean, nor does it profess to create any new obligations, or to impart efficacy to contracts void in themselves. But it did intend to preserve the obligatory force of valid contracts; and the principle advanced is not applicable to this case, which does not rest in a mere voluntary engagement to grant, but was an actual grant, in consideration of the benefits expressed in the preamble to be derived to the community, of corporate franchises, which are incorporeal hereditaments, considered in law as property, and properly the subjects of grant, involving a contract that the state should not resume, and that the Regents should hold and enjoy the grant, and all the rights derived under it; and it will scarcely be said, that such a consideration, the dissemination of learning and useful knowledge, in which the country has so deep an interest, is not a sufficient consideration, and that the payment of a pecuniary consideration is necessary to the validity of a grant by the state. Would it, or could it be said, that a voluntary donation from the state, by a grant of land to this institution, authorized to receive such donation, would be void, and that the land so given could be taken away again by the state at pleasure, and given to another. If not, neither can the franchises, the incorporeal hereditaments conferred by this act of incorporation, be taken away.

The principle is the same, equally applicable to both, and one is just as irrevocable and inviolable, as the other,— property, though of different descriptions, being the subject of each—among the rights granted, is that of acquiring and holding property in perpetuity; and the state is pledged not only to the corporation, but to all donors to the institution on the faith of this contract; and to revoke it, would be to violate the plighted faith of the state, that it shall remain inviolate. If the state has a right to revoke at will, this grant, it has the same right in relation to rail road, canal, and other corporations, which will not be pretended.

This brief view of the character and legal effect of the act incorporating the Regents of the University, results in the

opinion, that it is a contract protected by the Constitution of the United States, the obligation of which cannot be impaired by any act of the legislature of the state, without the assent of the corporation; and leads to the conclusion, consequent upon that opinion, that the act of 1825, ch. 190, is repugnant to that instrument, and therefore void.   It recognizes the organization and existence at that time of the corporation created by that act, and states in the preamble, that the good government and discipline of the University require important alterations in the act of incorporation.   It professes to discontinue and abolish the board of Regents, and the members of its several faculties, declaring that the faculties shall consist of professors alone; to appoint a number of persons by name, to be known by " the corporate title of trustees of the University " of Maryland; to invest them with all the powers and privileges before belonging to the corporation of the Regents, with power to elect a vice-president, and to appoint and dismiss the provost, professors, and lecturers, at pleasure; to establish new professorships, and to abolish old ones; and to make by-laws for the regulation and discipline of the institution; declares that the governor of the state for the time being, shall be ex-officio president of the board of trustees; that all the pecuniary concerns of the University shall be under the control and direction of the trustees, who shall have power to appoint a treasurer, and direct and control all expenditures of money; that all money thereafter raised or appropriated for the benefit of the University, shall be paid to the trustees, or to an officer appointed by them to receive it; that all the rights of property then possessed by the Regents, shall vest in the trustees; that vacancies occurring in the board of trustees shall be filled up by the executive of the state, and that, that act should go into effect and operation on the first day of June, 1826,—and it professes to repeal all such parts of the act creating the corporation of the Regents of the University, as are inconsistent therewith.   If it is possible to pass an act impairing the obligation of a contract, this is that act, if the act creating

the corporation of the Regents of the University is, in legal understanding, a contract. It attempts to do more than impair the obligation of the contract. Except for the protecting shield held over it by the Constitution of the United States, it would have the effect to annul it altogether, if there be not some inherent principle in the government of the state to forbid it. It not only aims to strip the existing corporation of the Regents of all the privileges and powers conferred upon it by the act of its creation, but to destroy the old corporation, and to create a new one in its place; and to give to the corporation of its own creation, all the same powers and privileges, with additional and important powers—such as the election of a vice-president, the appointment and dismission of professors, lecturers, &c. at pleasure, and the establishment of new professorships, and the abolition of old ones; to cause all money raised or appropriated for the benefit of the University to be paid to the corporation of " the trustees," and to vest in that corporation all the rights of property belonging to the corporation of the Regents; thus not only to deprive the Regents of the capacity to acquire and hold property in perpetuity in their corporate character, but to take from them the property they have already acquired and give it to the corporation of trustees, and to connect that corporation with the political power of the state, by declaring that the governor for the time being shall, ex-officio, be the president of the board of trustees, and that the executive of the state shall fill up all vacancies occurring in the board of trustees.

" It is a franchise for a number of persons to be incorporated and subsist as a body politic, with a power to maintain perpetual succession, and do other corporate acts." 2 *Black. Com.* 37. And by the act of 1812 it is expressly stipulated by the state, that this franchise, the corporation of the Regents of the University, shall continue for ever. And yet the act of 1825 professes, in words, to abolish the board (or corporation) of Regents, and declares that the several faculties shall thereafter consist of the professors alone. It then proceeds to appoint and incorporate a number of other per-

sons by name, to be known and distinguished by the corporate title of "the Trustees of the University of Maryland," and as if that was not enough, concludes with a repealing clause of every part of the act of 1812 inconsistent with its provisions; that is, to suffer so much of the act of 1812 as declares that there shall be an University established to remain in force, but to annul entirely the existing corporation, and to create another, constituted of different persons, to possess and exercise all the franchises (and more) granted to, and the property actually acquired by the former; keeping in mind, that in one case the corporate body, the artificial being composed of natural persons, the Regents, is the corporation attempted to be destroyed; and that in the other, the corporate body, the artificial being composed of other natural persons, the Trustees, is the corporation attempted to be created and substituted in its place, and not the University.

But the objection to the validity of the act of 1825, does not rest alone for support upon the construction of the Constitution of the United States. Independent of that instrument, and of any express restriction in the constitution of the state, there is a fundamental principle of right and justice, inherent in the nature and spirit of the social compact, (in this country at least) the character and genius of our government, the causes from which they sprang, and the purposes for which they were established, that rises above and restrains and sets bounds to the power of legislation, which the legislature cannot pass without exceeding its rightful authority. It is that principle which protects the life, liberty, and property of the citizen from violation, in the unjust exercise of legislative power.

The legislature has no right, without the consent of a corporation, to revoke or alter its charter, or take from it any of its franchises or property; they are alike beyond the reach of legislative power here, and the high prerogative power of the crown of England, which may create, but cannot at pleasure dissolve a corporation, or without its consent alter or amend its charter.

The parliament of England has been said to be omnipo-

tent. But restrained by public opinion, it has not undertaken to dissolve any corporation since the instances of the suppression of the Order of Templars in the time of Edward the Second, and of the religious houses in the reign of Henry the Eighth, and that power may be considered at this time as resting mainly in theory.

When in 1783, a bill was introduced for the purpose of remodelling the charter of the East India Company, it was successfully opposed by Mr. Pitt and Lord Thurlow, as subversive of the law and constitution of the country; and in the strong language of Lord Thurlow, " an atrocious violation of private property, which cut every Englishman to the bone." And it might be said, that the possession and exercise of such a power by the legislature of this state, would cut every free citizen of Maryland to the bone; not that a corporation is clothed with any peculiar sanctity, or that its property and rights are to be deemed more sacred and inviolable than the property and rights of any private individual. But, because the property and franchises of a corporation *are private property*, regarded as such by the law, and under the safeguard of the same principle, that protects and preserves from legislative violation the property and rights of individuals in their natural character. The law knows no distinction; if one can be invaded, so can the other. Vested, corporate, and individual rights, resting for protection on the same principle, the power to violate the former would necessarily involve the power to prostrate the latter; which would be at war with the purposes for which the social compact was entered into; and the nature and ends of *legislative* power, would furnish no limit to the exercise of it, as it was intended they should do.

To say that the legislature possesses the power to pass capriciously or at pleasure a valid act, taking from one his property and giving it to another, would be in this age, and in this state, a startling proposition, to which the assent of none could be yielded; and yet there is nothing to forbid it, if it is once conceded that they have the power to dissolve one cor-

poration, and take from it its franchises and property, without its consent, and transfer them to another.

But the bill of rights, which together with the form of government composes the constitution of this state, is not silent upon the subject. The sixth article declares, " that the legislative, executive, and judicial powers of government, ought to be forever separate and distinct from each other."

The legislature, executive, and judiciary, are all creatures of the constitution, each confined in its action to the circumscribed sphere assigned it, and cannot rightfully exercise any power which is repugnant to that instrument, or not within their respective sphere of action.

The province of the legislative department of the government is to make laws, confining itself within the limits prescribed by the constitution. It cannot usurp the powers confided to either of the other departments, without violating the declaration in the bill of rights, that they shall be forever separate and distinct from each other, which would be a subversion of the principles that lie at the foundation of the government. For if the legislature could, without control, exercise judicial as well as legislative powers, the tenure of every thing dear and valuable to the citizen, would be, the unrestricted will of that body; to guard against which, the provision was introduced for a division of the powers of the government.

It is not to be presumed that the legislature can ever have a wish, or would intentionally abuse or exceed its just powers. But it may (as it sometimes has done) incautiously and unadvisedly step beyond the strict limits of its authority; and it is the province and duty of a court, when called on judicially to decide upon the validity of the act, to pronounce it void, if satisfied that it is not warranted by the constitution; that being the paramount law to which all acts of the legislature not authorized by it, must yield.

This power and duty of the judicial department were asserted by the late general court in *Whittington vs. Polk*, 1 *Har. and John.* 236, and have been since by this court, in several

cases, among which are *Crane vs. Meginnis*, 1 *Gill and Johns.* 463, in which an act of assembly passed in 1823 divorcing *C. Meginnis* and *Mary* his wife, and directing *C. Meginnis* to pay annually thereafter three hundred dollars to a trustee who is named, for the use of *Mary Meginnis*, was adjudged to be unconstitutional and void, so far as it directed the annual payment by *C. Meginnis* of three hundred dollars to a trustee for the use of *Mary*, on the ground that it was an exercise by the legislature of judicial power. The provision for the payment of the annuity being considered as a legislative decree of alimony, which is recoverable in this state only on proceedings in chancery. And in *Berret vs. Oliver*, 7 *Gill and Johns.* 191, an act of the legislature declaring certain deeds and decrees to be void, and divesting certain persons named of real and personal property held under them, and vesting it in *W. E. Berret*, was pronounced to be a violation of the provision in the bill of rights, "that the legislative, executive, and judicial powers of government, ought to be forever separate and distinct from each other," and of the constitution of the United States, that "no state shall pass any law impairing the obligation of contracts," and utterly null and void.

The act of 1825 is obnoxious to the same objection. It professes to discontinue and abolish the corporation of the Regents of the University; to appoint a board of trustees composed of different persons, under the corporate name of the Trustees of the University of Maryland, "and to transfer to the new corporation thus attempted to be created, all the franchises and property of the corporation intended to be abolished; which, if effectual, would amount to a legislative ouster; a legislative judgment of dissolution; an exercise of judicial power not warranted by the constitution. A sentence of ouster or of dissolution, being strictly a judicial act, for some imputed delinquency ascertained on proceedings at law instituted for that purpose, which, though assuming the garb of a law, the legislature not being invested with a judicial power, is not competent to pass without the consent of the corporation.

The division of the powers of the government proclaimed by the sixth article of the bill of rights, and the twenty-first article of the same instrument, declaring, " that no free man ought to be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers or by the law of the land," were intended as restraints upon the legislative power, by means of the courts of justice in which the laws were to be administered, and where all would be entitled to be heard, and have an opportunity afforded them of asserting and defending their rights against any attempted invasion. By " the law of the land" is meant, by the due course and process of the law. *Co. Ins.* in the commentary upon the same words in *Magna Charta.* The general law, prescribed and existing as a rule of civil conduct, relating to the community in general, judicially to be administered by courts of justice. An act which only affects and exhausts itself upon a particular person, or his rights and privileges, and has no relation to the community in general, " is rather a sentence than a law." 1 *Blac. Com.* 44. A sentence that condemns without a hearing, and the very passing of which implies the absence of any general law or rule of civil conduct, by which the same purpose could be judicially affected in a court of law.

If the transferring one person's property to another, by a special and particular act of the legislature, is a depriving him of his property, by or according to the law of the land, then any legislative judgment or decree, in any possible form, would be according to the law of the land, although there existed at the time no law of the land upon the subject, and that too by a tribunal possessing no judicial power, and to which all such power is denied by the constitution. Such a construction would tend to the union of all the powers of the government in the legislature, and to impart the attribute of omnipotency to that department, contrary to the genius and spirit of all our institutions; and the office of courts would be not to declare the law or to administer the justice of the country, but to

execute legislative judgments and decrees, not authorized by the constitution. The act of 1825, therefore, though bearing the form of a law, being in effect a legislative judgment of dissolution of the corporation of the Regents of the University, is, in this view of the subject, unconstitutional and void.

It is not intended by these remarks, to call in question the various general laws for quieting possessions, &c. which the legislature has been in the habit of passing, both before and since the adoption of the present constitution of this state, nor to impeach the decisions upon these laws, which have been considered as resting upon different principles; though it may be that the legislature has sometimes been unadvisedly drawn into the passing of such a law, to effect a particular purpose, not known to and concealed from that body at the time; which, if any such case exists, points to the necessity for great caution in the passing of such a law, and furnishes an additional reason for objection to the exercise by the legislature of judicial power.

In *Norris vs. The Abingdon Academy,* 7 *Gill and Johns.* 7, an act of the legislature vesting the government of the academy in a new board of trustees, was decided by this court to be a violation of the rights of the old corporation, forbidden by the Constitution of the United States, and therefore void. The decision of that case was founded upon the prohibitory clause alone of the Constitution of the United States, which applies equally and with the same force to this, if there be nothing in the facts and circumstances of the case to exempt it from the operation of that instrument.

But it has been strongly urged, that if the act of 1825 was not passed with the previous consent of the corporation of the Regents, there was enough to authorize the inference by the jury of a subsequent assent and acceptance. It is perfectly clear that there was no previous consent, nor any evidence whatsoever offered, tending in any manner to prove such consent. On the contrary, the only evidence relating to that point, was that produced on the part of the plaintiff, with nothing offered on the part of the defendant to rebut it,

or in any way to weaken its force. *First*, the report of a joint committee of the two houses upon which the act was passed. In that report it is stated by the committee, to be their opinion, that the charter of the Regents " is radically defective, and requires fundamental alterations," that the difficulty of getting a quorum of the Regents to meet, and the want of time prevented them from ascertaining the opinion or wishes of the Regents as a body, with respect to alterations of the charter, " that there is nothing in the nature of the act of incorporation which deprives the general assembly of the constitutional power of making the change proposed by them, without the formal assent of the persons incorporated, and that assent is only necessary when a charter of incorporation is in the nature of a contract, as a bank charter, for instance, where a bonus has been stipulated in favour of the state, and where a consideration which would give binding force to a contract, has been paid." That report was adopted, and the changes proposed by the committee, embodied in the act founded upon it. The proceedings then of the legislature, manifestly show that no previous consent had been given; but on the contrary, that the committee charged with that subject, had been unable to ascertain the opinion or wishes of the Regents as a body in relation to an alteration of the charter, and that the legislature had been drawn into an error, and passed the act under the impression made by the ill-founded suggestion of the committee, that in the absence of a pecuniary consideration being paid for it, the charter had not the binding force of a contract, and therefore, that the consent of the corporation was unnecessary. And *secondly*, that on the 17th of March, 1826, soon after the act was passed, (which was on the 6th of March, 1826, at the December session, 1825,) at a regular corporate meeting of the board of Regents, a resolution was adopted with but one dissenting vote, that a committee of five, who were appointed for that purpose, should take the opinion of counsel upon the constitutionality of the act, with another resolution unanimously adopted, directing the committee, if the opinion so

obtained should be that it was unconstitutional, to prepare an address to the governor of the state, and to the trustees appointed for the government of the University, informing them of such opinion, and requesting them to defer acting until the act that had been passed, could be re-considered by the legislature, and in the event of the trustees determining to proceed, to adopt such legal measures as might be deemed necessary to resist the operation of the act. And that the committee having obtained from counsel an opinion that the act was unconstitutional, on the 22d May, 1826, and before the corporation of trustees went into operation, addressed a letter to the governor, and to each of the trustees, advising them of the opinion, and requesting them to suspend measures for carrying the act into operation until an application could be made to the legislature at their next meeting for a repeal of it; informing them, that they were prepared on the part of the Regents to make such arrangements with them as would produce the speediest judicial decision of the question, if they should deem it inexpedient to accede to the proposed delay, and requesting a reply to that communication, which does not appear to have been made. So that, there was not only no evidence whatsoever, of a previous corporate assent to the act of 1825, but an unequivocal subsequent dissent, expressed by solemn corporate acts before it was carried into operation, or the arrival of the time, (the 1st of June, 1826,) when by its own provisions it was to take effect. Which subsequent dissent, and proceedings of the corporation of Regents, independent of the report of the committee of the legislature, precludes the idea of any previous assent, and leaves no ground for presumption or inference of a subsequent assent prior to the 1st of June, 1826, when the trustees, in defiance of the corporation of Regents, and in disregard of its dissent, thus solemnly expressed and formally communicated, organized themselves as a corporation, under the supposed authority of the act of 1825. Still it has been contended, that the conduct and course of the corporation of Regents, after the organization of the corporation of trustees, were such, as to afford

evidence proper and sufficient to be left to the jury, from which to infer the assent from that time, of the former, to the act for the incorporation of the latter, and its acceptance of that act.

It may well be questioned, whether, and indeed it is difficult to perceive how, an unconstitutional act of the legislature, can be made constitutional and valid, by a subsequent acquiescence in it. The whole community " have an interest in preserving the constitutional limitations upon the exercise of legislative power." How can the subsequent approval of, or assent to it, give to the legislature a power, which it did not possess at the time it was passed : and if it cannot, how can it give effect to the act itself, which was passed without authority ? But be that as it may, and to proceed : An act of incorporation may be offered for acceptance, and when accepted by those to whom it is offered, it becomes a contract. If the act of 1825 had been made to take effect when, or if assented to by the corporation of the Regents, it would until that assent was given, have been in *fieri*; and when given, a law, if accepted by the trustees; and that would not have been unconstitutional. Parties to a contract have a right to rescind it, and as between the state and the corporation of the Regents, such a provision would have amounted to an offer on the part of the state to rescind the contract of the act of 1812, and if assented to by the corporation, would have been an abrogation of it. But no such offer was made. The act of 1825 was a peremptory and unconditional dissolution of the corporation of the Regents ; made by its terms, to take effect with or without its consent, and manifestly passed under the impression, that no consent was necessary.

It is not intended by what has been said, to deny that an act for altering a charter, to the passing of which, previous assent has not been given, can be constitutional, unless it contains an express offer for acceptance, or is made by its terms to depend upon a subsequent assent. The passing of it with nothing more, amounts to an offer only for accept-

ance; and if afterwards accepted, either expressly or by acting under it, it then receives life, and becomes an operative law—as in the cases of the various acts altering or amending existing bank and other charters.

And here it is proper to remark, that the question of acceptance does not, and cannot arise in this case. The act of 1825 did not propose merely to alter or amend the existing charter of the Regents, or to give them another; but to give a new charter to the trustees named. There was nothing therefore for the Regents to accept, or to reject. They could neither reject or accept that which was not offered to them, but attempted to be given to others. The trustees alone had the privilege to reject or accept the act of incorporation that was offered to them—and the Regents were put without the pale of the consideration of the legislature. The question then, is not whether the corporation of Regents accepted the act of 1825, but whether there was any evidence of its having assented to it, after the organization of the corporation of trustees.

It appears that after the trustees had organized as a corporation, all the members of the faculty of physic, and members of each of the other faculties, were appointed, and accepted situations under them as professors; and that, from that time the corporation of the Regents ceased to exert its corporate functions, until the month of September, 1837, and this is considered as evidence to prove the assent of that corporation to the act of 1825.

It is admitted that the acceptance of an act of incorporation by the persons to whom it is offered, or the assent of an existing corporation to an act for an alteration of its charter, may be inferred from facts demonstrative of such acceptance or assent, without the production of a written instrument or vote of acceptance or assent on the books of the corporation; such as in the first case, the fact of actual organization, which furnishes the presumption of previous acceptance, or may be considered, as of itself an act of acceptance, and in the latter, acts and transactions by the corporation or its

authorized officers, in pursuance of the proposed alterations of the existing charter, showing the assent of the corporation to such alterations.    But the acts, from which the assent of an existing corporation to an alteration of its charter, may and can alone be inferred, must be corporate acts, acts of the corporation, or acts of its authorized officers or agents.    It is a vital principle of a corporate body " that the members are to do no act which may destroy its existence, or injure its privileges."    3 *Desaus.* 574.    2 *Binn. R.* 441.    " Particular members may express their private consents to any act, by words or signing their names, yet this does not bind the corporation."    1 *Black. Com.* 575.    *Angell and Ames on Corp.* 107.    And " since individual members of a corporation cannot, unless authorized, bind the body by express promises, neither can any corporate engagements be implied from their unsanctioned conduct or declarations, as corporations can be bound only by joint and corporate acts, so it is only from such acts, done either by the corporation as a body, or by its authorized agents, that any implication can be made binding it in law."    *Ib.* 130.    *Proprietors of the Canal and Bridge Co. vs. Gordon,* 1 *Pick. R.* 297.

If no corporate engagement can be implied from the unauthorized conduct or declaration of individual members, if no implication can be made from them, binding in law upon the corporation, in relation to ordinary transactions, on what principle, can any inference be drawn from them, going to the very existence of the corporation?    In this case, the members of the different faculties who accepted situations under the corporation of the trustees, were not in doing so, acting as the authorized agents of the corporation of Regents, nor for any thing that appears, under the sanction of any corporate act of assent to the act of 1825, but in disregard of solemn and express corporate acts of dissent, and protestation against the carrying that act into operation by the trustees— and the law does not permit any inference of assent to that act, by the corporation of Regents, to be drawn from such doings—and more particularly, in the face of its clearly

expressed dissent. The most that can be said of it is, that the individual members who accepted places under the trustees, wanted situations which they were afraid of losing, and acted alone under that impulse. Then, what act, corporate or otherwise, was done by the corporation of Regents, showing or implying, or legally tending to show its assent to the act for incorporating the trustees, and for its own dissolution? It was in full existence and operation when it was passed, as the record shows. It protested against it after it was passed, and requested the trustees not to carry it into execution. That was no act of assent. A number of its members took situations and acted under the trustees, which it could not prevent; that was no assent by the corporation, but by doing so, and withholding themselves from the discharge of their duties as members of the corporation of Regents, though they did not therefore cease to be members, they caused that corporation as a result of the act of 1825, to cease from that time to perform its functions until September, 1837, when the members who had taken situations under the trustees, resigned them, and returned to their duty. During that time it was passive and did nothing, yielding only (as the members who accepted places under the trustees had done) to necessity, and doing no act, from which its assent could be implied, and in the absence of any written instrument or vote of assent, some other act of the corporate body, or of its authorized agent affording the presumption of its assent, should have been produced; and the more particularly, as it is an act not beneficial to the corporation, but one that aims directly at its dissolution, and the presumption in the absence of any express corporate act to the contrary, would rather be against the assent; seeing, that the last corporate act it did, was a vote of express dissent. It was unwilling submission only to legislative power and influence, and not an adoption of its act.

In *Allen vs. McKeen*, 1 *Sumner*, 276, where a corporation passed a resolution that they acquiesced in an act of the legislature, it was decided not to be an adoption of it, but ex-

pressive of mere submission to the legislative will; and that if it could be construed into an approval, it could not give effect to an unconstitutional act.    Suppose none of the members of either of the faculties of the corporation of Regents had taken office under the trustees, and they had appointed others and gone into operation; and that the corporation of Regents had by no act assented to the act of 1825, but have become wholly inactive, and performed none of their corporate functions; such non-user, if it would have been deemed sufficient cause of forfeiture, on proceedings at law instituted for that purpose, would have been no evidence of assent to the act; but neglect of duty, or a violation of the implied condition of its contract, for which it would have deserved to be dissolved.    But the act of 1825 could not have taken the place of judicial proceedings to work a dissolution, and thereby become valid and effectual.    Neither non-user nor mis-user of corporate franchises, has ever been held sufficient to authorize the granting the same franchises to others, before a forfeiture has been judicially declared.    And how in principle, does this case differ from that which has been put, supposing for a moment, that the conduct of the corporation of Regents was such as to have furnished sufficient cause of dissolution upon judicial proceedings?    But here it is proposed to give effect to an act of assembly, which was passed before any cause of dissolution existed; on the ground that assent by the corporation to that act, arising from a supposed subsequent cause of forfeiture might be presumed; which cannot be against the express dissent of the corporation by a formal vote.    An inference of assent by a corporation to an act of assembly, after it has passed, can no more be drawn from a subsequent non-user or mis-user of its franchises, than an inference of consent to its being passed, can be drawn from a previous non-user or mis-user, which is no where pretended; otherwise, there would be no necessity for a judicial ascertainment and declaration of forfeiture, before a new charter can be granted.    Nor can effect be given to this act of assembly by considering the non-user by the corporation of Re-

gents, as equivalent to a surrender of its franchises. That can only be done by deed to the state. 1 *Salk. Rep.* 191. *Angell and Ames on Corp.* 507. 2 *Kent's Com.* 311, *et al.* And a court is not warranted to presume a surrender of the corporate rights and a dissolution of the corporation, from a mere intentional abandonment of the franchises, unless there be something in the act of incorporation to justify it; as in the case of some of the incorporated companies in New York, under which, for the sake of the remedy and in favour of creditors, the courts of that state have acted upon such presumption. *Slee vs. Bloom,* 19 *Johns. Rep.* 456. *Briggs vs. Penniman,* 8 *Cowen,* 387. But those cases go no further, and recognize the general rule. And if an actual abandonment of the corporate franchises will not warrant the presumption of a virtual surrender of the corporate rights, and a dissolution of the corporation, how can the assent of a corporate body, to an act dissolving the corporation, be inferred or presumed from a mere non-user of the franchises produced by that very act? and that too, in the face of a corporate act of express dissent, remaining unrescinded on the books of the corporation. In no view, therefore, is it believed, that effect can be given to the act of 1825; and whatever may be the condition of the corporation of the Regents, the trustees have no authority, as governors of the University, under that act.

But it has been again further contended, that the faculty of physic of the University, became dissolved or extinct on the acceptance by the professors of professorships under the trustees, which it is supposed amounted to resignations of their situations as members of the corporation of the Regents; and that by the loss of that integral part the corporation became dissolved, and incompetent to institute or sustain this suit.

The same argument would perhaps equally apply to some of the other faculties; and if either of the faculties was thereby lost, and not restored at the time of bringing the suit, the objection would be fatal to a recovery, whether the corporation was dissolved or only suspended (perhaps more properly the latter) considered as a corporation of integral parts, and

not existing as a corporation *de facto*.   But their accepting situations under the trustees, did not, in law, amount to resignations of their professorships. in the corporation of the Regents.   " An office in a corporation may be resigned in two ways : by an express agreement between the officer and the corporation, or by such an agreement implied, from his being elected to another office incompatible with it."   And " to complete a resignation, it is necessary that the corporation manifest their acceptance of the offer to resign, which may be done by an entry in the public books, or electing another person to fill the place, treating it as vacant."   *Will-cock on Municipal Corporations*, 14 *Law Lib.* 132, 133, 238, 240.   *Angell and Ames on Corp.* 254, 255.   It is incidental to the right to appoint.   *Ib.*

By an election to " another incompatible office," is meant another office in the same corporation, as is shown by the several examples put in the same books.   Here the several members of the corporation of Regents, who accepted offices under the trustees, were not elected to other offices in the corporation of Regents, but to offices in another corporation ; and there is no evidence of any acceptance of their resignations by the corporation of the Regents, by any entries in their books, or the elections of other persons to fill their places treating them as vacant, or in any other manner ; nor is there any evidence of their having offered to resign.   If individual members of a corporation could resign their situations at pleasure, without the consent of the corporation, it would be in the power of any definite integral part of a corporation composed of integral parts, having the right to fill up vacancies in their own bodies, at any time to dissolve the corporation against its will, and even of a mere majority of any such integral part ; and thus a corporation so constituted, would be always at the mercy of a minority of its members ; and hence the propriety of, and necessity for the rule, that there can be no resignation by a member without the acceptance of it by the corporation ; the appointments given by the trustees to members of the corporation of Regents, did not make them

OF MARYLAND. 423

The Regents of the University of Maryland *vs.* Williams.—1838.

the less, members of that corporation. " Where a new charter which is void, assumes to incorporate a place where there is an existing corporation, and includes the members of the ancient corporation together with new men, if a sufficient number of the ancient corporators, professing to act under the new charter, without any of the new men joining, make a by-law, which they are capable of making under the ancient constitution, their act is referred to their genuine authority, and not to the new charter, and the by-law will be good." *Willcock on Municipal Corporations*, 14 *Law Lib.* 57, 103. 1 *Salk. Rep.* 191. Which shows that the taking a situation under a void charter or act of incorporation, is not a resignation of a situation in another existing corporation, and has not that effect, which is just this case. The acceptance of situations under the trustees, might have furnished ground to the corporation of Regents for removing them, if the power to do so had remained ; but that would have been to work a dissolution or suspension of the corporation, if the faculties alone are empowered to fill up the vacancies in their own bodies as has been supposed.

And thus the corporation of Regents was constrained by the act of 1825, and the trustees acting under it to that very inactivity, which is now charged upon it as a fault or as evidence of its assent to that act. Besides, the nineteenth section of the act of 1812, provides, that the charter shall not be avoided or forfeited by any thing done or transacted by the corporation, contrary to the tenor of that act, through oversight, misapprehension, or mistake, either by any court of law, or by the general assembly. The spirit of which solicitude to preserve the corporation, would seem to be, that it should be equally protected against any omission arising from the same cause. And if the corporation could, through oversight or misapprehension, do no corporate act to avoid or forfeit the charter, how could the mistaken course of the individual members of an integral part work that mischief? Or could it have been intended that it should be in their power to dissolve the corporation? Their acceptance, however,

of places under the trustees not amounting to resignations of their situations in the corporation of Regents, and not having the effect to dissolve or suspend the corporation; if there remained to each faculty when they returned to their duty, which was before the bringing of the suit, of those who were members when the trustees took upon themselves the government of the University, a majority of the number of which each should properly be composed, whether residing in Baltimore or not, there was no objection to the competency of the corporation to institute the action. What number did in fact remain does not distinctly appear from the record. But the plaintiff having proved the fact of incorporation, the burden of showing a dissolution of the corporation rested upon the defendant.

These remarks have been made upon the hypothesis, that the corporation is composed of distinct, definite, integral parts. But is that so? The faculties of theology and law, are definite classes, consisting of seven members each. But the faculties of physic and of the arts and sciences, are indefinite parts,—clearly the faculty of the arts and sciences.

In relation to that faculty, the language of the tenth section of the act is, that "the professors of the arts and sciences, (in the plural,) and three others, shall form and constitute the faculty of the arts and sciences." Now, "the professors" may be two, or any larger indefinite number. They cannot, however, be fewer than two, and as there must be three more, that faculty when full, would consist of five at least, of which, three is a majority,—the number that is at least necessary to preserve the faculty. With respect to the faculty of physic, the language used is "that the professors now appointed and authorized in the College of Medicine of Maryland, shall constitute the faculty of physic," without specifying any particular number. But they who were at that time, professors in the College of Medicine, were merely designated as the persons, who should in the first instance compose that faculty, to the exclusion of the president and lecturers. That body, as originally formed, consisted of six members, appointed in

the law itself, for the purpose of organizing and carrying the corporation into operation.   But the Regents of that institution were authorized, from time to time, to appoint professors of the different branches of medicine, without limitation as to number ; and seeing how many branches there are, it would seem, that the policy of that act was intended to be adopted ; leaving the faculty to be composed thereafter, of as many members as from time to time should be thought proper and advisable, according to the condition of the institution ; as it was left to the Regents of the College of Medicine, to appoint as many professors, as from time to time might be thought necessary and proper; and seeing too, that seven is designated as the definite number of members, to compose each of the two faculties of divinity and law.   But not so with respect to the faculties of the arts and sciences, and of physic, which might require a larger number ; which circumstance would seem further to indicate, that the two faculties of physic and of the arts and sciences, were not intended to be definite classes.   Nor is it clear that it is strictly a corporation of integral parts.   " The members of the four faculties," in the language of the act, being as a whole, the persons incorporated, and by the eleventh section a majority of the whole number of Regents being declared to be a quorum competent to make fundamental regulations for the government and discipline of the University, and to do other corporate business, although every member of any one faculty, and a large portion of another, should be absent from such meeting ; whereas, ordinarily, the attendance of a majority of the members of each class, when the corporation is composed of definite integral parts, is necessary to constitute a corporate meeting or assembly.   But when this suit was brought, there was in fact a sufficient number of members in each faculty, and whether regularly appointed or not, was not a matter to be inquired of at the trial.   No advantage can be taken of any non-user or mis-user on the part of a corporation, by any defendant in any collateral action.

There are two modes of proceeding judicially to ascertain

and enforce the forfeiture of a charter.   The one is by *scire facias*, which is the proper process when there is a *legally* existing body capable of acting, but who have abused their power.   The other by information in nature of a *quo warranto;* which properly applies, where there is a corporate body, *de facto* only, but who take upon themselves to act, though from some defect in their constitution or organization, they cannot legally exercise their powers.   But are entitled to be heard in either case, before they are condemned on proceedings instituted for that purpose, which must be at the instance of the government, and in no other way.   For, besides the right of the corporation to a full hearing and judicial judgment of forfeiture, before it can be stripped of its franchises and property, or be considered as dissolved, the government, with which the contract is made, may not wish to enforce a forfeiture, and may if it chooses to do so, waive the breach of any condition of the contract arising out of the charter.

This principle runs through all the books, and has been judicially enforced in a case in the Supreme Court of *New York*, strictly analogous to this.   *The Trustees of Vernon Society vs. Hills,* 6 *Cowen,* 23—where it was determined, that though the trustees were at the time of bringing the suit a corporation *de facto only*, not having been appointed in the manner directed by the charter, it could not be taken advantage of by the defendant without showing that proceedings had been instituted by the government, and carried on to a judgment of ouster.   Upon the whole, there is nothing to sustain the objection, that the plaintiffs were not competent to sue at the time of bringing the action, on the ground that the corporation was dissolved by the loss of an integral part.

It may not be amiss here to observe, that whatever may have been the understanding, it is by no means clear, that the power to fill up vacancies in the different faculties by the appointment of new members of faculty, does not as a necessary incident, belong to the Regents in their corporate character, and not to the faculties.   The power given to the faculties by the eighth section, being to appoint respectively their own

" professors and lecturers," who may or may not be selected from their own bodies. And when taken from among themselves, clothed in the two-fold character of members of the faculty so selecting them, and also of professors and lecturers. May not a faculty consisting of a definite number, be full, and yet have professors and lecturers appointed by itself, not belonging to it as members of the faculty, but rather as officers or agents? and if so, may not the power " to appoint its own professors and lecturers," look alone to the appointment of persons in that character only, and not as members of the faculty, leaving the power to fill up vacancies in the respective faculties to the corporation of Regents, by the appointment of new members?

The second and third exceptions, and the second and third prayers, in the fourth exception, being abandoned, it is unnecessary to examine them.

And the only remaining question is, whether this suit can be sustained against the defendant for money received by him as the treasurer of the trustees ; which arises on the first prayer in the fourth exception. And the opinion of this court is, that the plaintiffs are entitled to recover from the defendant any money amounting to a sum within the jurisdiction of the court below, remaining in his hands at the time the suit was brought ; and which was received by him as the treasurer of the persons claiming under the act of 1825, to be the trustees of the University of Maryland, at any time within three years before the suit was instituted, to which they can show themselves entitled as the Regents of the University, or which properly belongs to that institution.—But no sum not received within that time, the act of limitations being pleaded and relied upon by the defendant.

**JUDGMENT REVERSED AND PROCEDENDO AWARDED.**